IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30968
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHANEY L. PHILLIPS; EMERSON C. NEWMAN,

Defendants-Appellants.
_____

Appeals from the United States District Court for the
Middle District of Louisiana
_____

July 13, 2000

Before JOLLY, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal presents evidence of several discrete schemes of local corruption involving ghost employees, payment of salary kickbacks, and misuse of state government funds. Based on this evidence and other related illegal conduct, a federal jury convicted the appellants, Chaney Phillips, the tax assessor for St. Helena Parish, Louisiana, and Emerson C. Newman, a political ally, on all counts of a twenty-count indictment, charging conspiracy, mail fraud, engaging in an illegal monetary transaction, theft involving a federally funded program, money

laundering, and perjury.[1]  The district court sentenced Phillips to serve sixty months concurrently on each of counts 1, 2, and 16-20, and ninety-seven months concurrently on each of counts 3, 4, and 5-14.  The district court also ordered Phillips to pay restitution in the sum of $225,587.56.  The district court sentenced Newman to fifty-one months for counts 1 through 15, with restitution in the amount of $224,404.56.

We reverse their convictions with respect to theft involving a federally funded program, 18 U.S.C. § 666, because we find no adequate relationship between the tax assessor's office and the federal funds.  As the money laundering convictions under counts

---

[1]The individual counts of the indictment are addressed to particular schemes.  No count pertains to the full range of alleged malfeasance.  Specifically, the twenty-count indictment charged Phillips and Newman jointly with (count 1) conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341 and to engage in an illegal monetary transaction in violation of 18 U.S.C. § 371 (related to Newman's first appearance on the payroll in 1990 and Jean Newman's alleged pseudo-employment 1990-92), and to violate 18 U.S.C. § 666; (count 2) mail fraud in violation of 18 U.S.C. § 1341 (involving negotiation of a $15,000 life insurance check after Jean's death); (count 3) an illegal monetary transaction in violation of 18 U.S.C. § 1957 (related to the same $15,000 check); (count 4) theft concerning a federally funded program in violation of 18 U.S.C. § 666 (concerning Newman's 1995 alleged pseudo-employment only); and (counts 5-14) money laundering in violation of 18 U.S.C. § 1956 (involving financial transactions with respect to the employment checks from Newman's 1995 alleged pseudo-employment).  Count fifteen charged Newman alone with perjury before the Grand Jury in violation of 18 U.S.C. § 1623 (related to false sale of a horse to Phillips and Phillips's hardware account).  Finally, counts sixteen through twenty charged Phillips with five additional counts of mail fraud in violation of 18 U.S.C. § 1341 (related to Phillips's clothing store scheme).

five through fourteen are tied wholly to the § 666 charge, the convictions under counts five through fourteen also are reversed. We affirm the convictions, however, on all the indictment's remaining counts.

I

Phillips served as the elected Tax Assessor for St. Helena Parish, Louisiana, from 1981 to 1997. In 1997, Phillips was elected sheriff for St. Helena Parish and served in that capacity until his conviction. Newman, a friend and political supporter, owned and operated a hardware store in Greensburg, St. Helena Parish, with his first wife, Jean. After a long illness, Jean died of cancer in July of 1992.

The evidence focused on several different schemes involving Phillips and Newman. From a monetary perspective, the most significant of these was an insurance scheme that ran from 1990-92. Triggering the scheme was the Newmans' loss of health insurance sometime in late 1989 or early 1990. Starting in 1990, Phillips placed Newman and his wife Jean on the assessor's payroll so that they would be eligible for health insurance benefits. The Newmans purportedly were hired to assist in bringing the assessment district in compliance with state property assessment regulations and/or to act as "spotters" for the assessor's office. Their ownership and management of Greensburg's largest hardware store

supposedly allowed them to look for signs of new construction or property improvement that would affect a property's assessed value. According to the defendants, the parish's lack of a building code or permit system necessitated that someone fill this role.[2]

Phillips employed Newman for three months. Thereafter, Newman resigned the position, only to be replaced by Jean on the assessor's payroll. She remained there through June 1992, one month prior to her death. The government contended that the Newmans either did no work for their $800 per month paychecks or they did insufficient work for this salary. The evidence at trial, especially when viewed most favorably from the point of view of the government as the prevailing party, allowed the jury reasonably to conclude that the Newmans did little or no work for these benefits, and that the Newmans kickbacked their salaries to Phillips.

While on the payroll in this period, the Newmans received a gross salary totaling $23,200. They also received $177,538.19 in health insurance benefits through the Louisiana Assessors' Insurance Fund ("LAIF"). Additionally, as part of the benefits conferred by the insurance plan, Newman received a one-time $15,000 payment as beneficiary of Jean's LAIF life insurance policy.

---

[2]The testimony showed that Phillips also paid two other individuals--Laura Bankston and Patricia Easley--relatively small amounts, $150 per month over a ten- to fifteen-year period, to perform this role.

There were other schemes. The "hardware scheme" relates to a later period of employment, starting approximately two and one-half years later in February 1995, when Newman again appeared on the payroll of the assessor's office. He remained there for ten months. During this period, Newman received paychecks amounting to $8,000, or $4,758 after taxes. Newman credited this entire amount to Phillips's account at Newman's hardware store. Phillips and Newman contended that the credits to Phillips's account stemmed from the sale of a horse that Phillips allegedly sold to Newman.

The "clothing scheme" involved Phillips only. On three occasions Phillips charged personal items of clothing from a men's store to the assessor's office. The store billed these charges to the assessor's office as employee uniforms. Upon learning of the investigation into the activities of the assessor's office, Phillips paid cash to the store owner and received in return a refund check with which to reimburse the assessor's office. The store's proprietor, David Albin, testified at trial to these transactions.

Still another scheme was introduced at trial, although not alleged in the indictment: a vote-buying scheme. The government introduced this evidence to show intent and motive under Fed. R. Evid. 404(b). As we noted, in 1997, Phillips ran for sheriff in a special election and won. During this election, Newman paid two

5

individuals to vote for Phillips.  An individual brought potential voters to Newman's hardware store, where they checked in with Newman.  They next went to the courthouse and voted; then they returned to the store where Newman paid each of them twenty dollars for voting for Phillips.  The individuals receiving money for their votes, as well as the go-between and Newman, were arrested and charged in conjunction with these crimes by state officials.  Phillips was never charged in this matter.  Indeed, an effort to implicate Phillips in this scheme failed when he rebuffed an approach by the government's informer.

## II

We first set out the various standards of review that will be applied in our review of these convictions.  First, we review the conviction "viewing the evidence in the light most favorable to the government, [to determine whether] a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."  United States v. Greer, 137 F.3d 247, 249 (5th Cir. 1998).  We review questions of law and application of statutes de novo.  See Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 891 (5th Cir. 1998); United States v. Westmoreland, 841 F.2d 572, 576 (5th Cir. 1988).  We review the district court's admission of evidence for an abuse of discretion.  See United States v. Pace, 10 F.3d 1106, 1113 (5th Cir. 1993).  If we find an

6

abuse of discretion, the harmless error doctrine is applied.  See

United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996).  We

thus affirm evidentiary rulings unless the district court abused

its discretion and a substantial right of the complaining party was

affected.  See United States v. Asibor, 109 F.3d 1023, 1032 (5th

Cir. 1997).

III

We first consider the 18 U.S.C. § 666 convictions, convictions

that stem only from Newman's 1995 employment.[3]  Section 666, is

---

[3]We need not address the conspiracy count (count 1), or the mail fraud counts (counts 2 and 16-20).  With respect to the conspiracy count (count 1), the appellants were charged with engaging in a conspiracy to violate three laws of the United States; that is, the mail fraud statutes (§ 1346), the money laundering statutes (for negotiating the $15,000 check) (§ 1957), and theft from a federally funded program (§ 666).  In reversing the theft from a federally funded program conviction (count 4), and the money laundering convictions (counts 5 through 14), effectively we have held, by concluding that the record here does not support the essential elements of the crimes, that the illegal conspiracy did not encompass these criminal statutes.  Nevertheless, we find nothing in the briefs that challenges the conspiracy conviction based on the mail fraud statute, and, to be sure, the evidence clearly is sufficient to support such a conspiracy; consequently, the convictions of each of the defendants under count 1 are affirmed.

Count 2 of the indictment, alleging mail fraud, relates only to the 1990-92 scheme, and charges that Phillips and Newman devised a scheme, and in order to effectuate the scheme, knowingly caused a check payment to Newman in the amount of $15,000 to be sent and delivered by the United States Postal Service.  This check was paid under the insurance policy to Newman, as beneficiary, upon the death of his wife, Jean.  Counts 16-20 relate to the "clothing scheme" involving Phillips alone.  These counts charge that Phillips devised a scheme to defraud the assessor's office for his personal benefit, by instructing, on two occasions, a clothing

entitled "Theft or bribery concerning programs receiving Federal

funds."[4]    The  elements  of  the  crime  as  presented  by  the

store proprietor to bill the assessor's office for sums labeled as
ladies uniform purchases, which were, in fact, personal purchases
of clothing for himself.  The invoices were sent by the mails, and
the assessor's office paid these invoices through the mails.  Each
of these uses constitutes a count of the indictment.  The last
count goes to Phillips's attempt to coverup his scheme by
requesting that the store refund money to the assessor's office,
again through the mails.  On appeal, they are not contesting that
the government's evidence failed to  establish the crime of mail
fraud, either with respect to the life insurance check or the
clothing store scheme.  In any event, the evidence is clearly
sufficient to sustain these convictions under this count and the
convictions on counts 2 and 16-20 are affirmed.

Count 3 charges that Phillips and Newman engaged in an illegal
money transaction involving property derived from mail fraud when
Newman negotiated the $15,000 death benefit check, in violation of
18 U.S.C. § 1957.  With respect to count 3, only Phillips
challenges his conviction, arguing that he cannot be held to have
aided and abetted Newman in this crime.  This is an issue we
discuss later and in which we find no merit.  The convictions of
each of the defendants on count 3 are affirmed.

[4]The statute states in relevant part:

(a) Whoever, if the circumstance described in subsection
(b) of this section exists-
    (1) being an agent of an organization, or of a
State, local, or Indian tribal government, or any agency
thereof-
        (A) embezzles, steals, obtains by fraud, or
otherwise without authority knowingly converts to the use
of  any  person  other  than  the  rightful  owners  or
intentionally misapplies, property that-
            (i) is valued at $5,000 or more and
            (ii) is owned by, or is under the care,
custody, or control of such organization, government, or
agency; or
        (B)  corruptly  solicits  or  demands  for  the
benefit of any person, or accepts or agrees to accept,
anything  of  value  from  any  person,  intending  to  be
influenced or rewarded in connection with any business,

prosecution under the facts in this case and as set forth by the district court in its jury charge are:  (1) the defendant is an agent of the relevant state or local government or agency; (2) which received in excess of $10,000 under a federal program involving a federal grant, etc.; (3) the defendant committed the statutorily proscribed acts with respect to property that was owned by, or under the care, custody, or control of the state or local government or agency; and (4) the property at issue had a value in excess of $5,000.  The defendants focus their argument only the first element, i.e., that Phillips had an agency relationship with

transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; . . .

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

. . .

(d) As used in this section-

(1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.

(2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program . . . .

9

a recipient of federal monies. Indeed, given the evidence that was admitted into the trial record (some of which is challenged on admissibility grounds), the jury reasonably found on the evidence before it that Phillips wrongly converted funds of the assessor's office in placing Newman on the payroll in 1995, and that Phillips corruptly accepted something of value from someone who expected to be rewarded in a transaction with the assessor's office, when Philips accepted kickbacks from Newman.[5] We should make clear that the count charging a § 666 violation did not allege the conduct occurring with respect to the 1990-92 insurance scam.

The federal funds in question were food stamps provided to parish residents. The program was administered, and the food stamps issued, by an agency that was part of the parish government.[6] Thus, the question is whether, for purposes of § 666, Phillips as tax assessor was an agent of the parish.

---

[5]Newman was convicted under § 666 as an aider and abettor.

[6]We make specific note that the food stamps that constitute the basis of this prosecution are a federal individual entitlement. There could be some question whether individual entitlement benefits can constitute the benefits referred to in subsection (b). The language of this subsection appears to refer to federal benefits provided to state and local governments *qua* governments. This reading would not be inconsistent with the legislative history. Cf. <u>Fischer v. United States</u>, __ U.S. __, 120 S.Ct. 1780, 2000 WL 574360, *6-8 (majority opinion), *9 (Thomas, J., dissenting) (May 15, 2000). This point, however, has not been raised on appeal.

Consistent with the broad terms of the statute, the district court instructed the jury that Phillips and Newman could be convicted under the Act if it found Phillips to be authorized to act on behalf a government or agency receiving federal funds. The district court instructed the jury that "[u]nder Louisiana law, tax assessors are parish officers." The government argued to the jury and it now argues before us on appeal that, for purposes of § 666, St. Helena Parish is a local governmental body and the tax assessor is a parish agent. Thus, the agency question in this appeal turns entirely on whether Phillips was an agent of St. Helena Parish for purposes of § 666. For the reasons provided below, we conclude that Phillips was not an agent of St. Helena Parish under § 666.

1

In determining the proper meaning of "agent" as applied in this case we start with its statutory language. Under § 666(a)(1) and (b), the defendant must "an agent of an organization, government, or agency" that receives in excess of $10,000 in a one-year period. See also United States v. Moeller, 987 F.2d 1134, 1137 n.9 (5th Cir. 1993)("The defendant must be an 'agent' of a 'government agency' that receives in excess of $10,000 from the federal government within a one-year period."). Subsection (d)(1) broadly defines "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization

11

or government, includes a servant or employee, and a partner, director, officer, manager, and representative." The question is whether this definition--conceding the elasticity of its general wording--properly can be read to make the tax assessor's office an agent of the parish for purposes of this § 666 prosecution. As part of § 666, subsection (d)(1) must be read in the context of that statute whose purpose is to protect the integrity of federal funds.[7] We know from the Supreme Court's decision in Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 473-74 (1997), that the funds in question need not be purely federal, nor must the conduct in question have a direct effect on federal funds. The statute

_____

[7]Our application of agency principles fully comports with the statute's legislative history. That history reveals Congress' concern with a defendant's ability to administer or control the federal funds provided to a particular agency. In Westmoreland, in interpreting the legislative history, we stated that "Congress has cast a broad net to encompass local officials who may administer federal funds, regardless of whether they do." 841 F.2d at 577. See also id. at 578 ("Although the extent of the federal government's assistance programs will bring many organizations and agencies within the statute's scope, the statute limits its reach to entities that receive a substantial amount of federal funds and to agents who have the authority to effect significant transactions."). See also United States v. Marmolejo, 89 F.3d 1185, 1192-93 (5th Cir. 1996), *aff'd sub nom.* Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469 (1997); United States v. Jennings, 160 F.3d 1006, 1012 (4th Cir. 1998) ("This subsection . . . prohibits payoffs to state and local officials who influence the distribution of federal funds."); United States v. Rooney, 37 F.3d 847, 851 (2d Cir. 1994) (interpreting § 666's "manifest purpose" as "to safeguard finite federal resources from corruption and *to police those with control of federal funds*.") (emphasis added; citation omitted).

12

possibly can reach misuse of virtually all funds of an agency that administers the federal program in question. Id. It is a different matter altogether, however, to suggest that the statute can reach any government employee who misappropriates purely local funds, without regard to how organizationally removed the employee is from the particular agency that administers the federal program.[8] Thus, we think that, in the context of the facts of this appeal and in the light of decided cases, the question of whether Phillips was an agent of St. Helena Parish within the meaning of § 666, turns on whether Phillips, as tax assessor, was authorized to act on behalf of the parish with respect to its funds.[9] [10]

---

[8]After all, the statute's title--"[t]heft or bribery concerning programs receiving Federal funds"--is some evidence that Congress intended to address only illegal acts that concern federally-funded programs.

[9]We have stated the question perhaps more broadly than necessary. See Salinas, 118 S.Ct. at 474 (suggesting statute might require some minimum degree of connection between the illegal conduct and the federal program funds) ("We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by federal funds themselves. And that relationship is close enough to satisfy whatever connection the statute might require."). Because of the absence of evidence that connects the assessor's office to control or expenditure of any funds of the parish, we need not consider whether there is yet some remoteness of connection to federal funds that § 666 will not reach.

[10]The dissent seems to suggest that we impose a requirement under the statute that a defendant be authorized to act with respect to the agency's funds. If this is the suggestion of the

13

The answer to this question first requires an understanding of the relationship between an assessor and a parish under Louisiana law. The Louisiana Constitution, as well as statute, establishes assessment districts as independent of parish government and therefore, although Phillips was the tax assessor for property in the parish, the parish has no power, authority, or control over the assessor's duties or job. See La. Const. art. VI, §§ 5(G) and 7(B), and art. VII, § 24 ("Tax Assessors"). An assessor's duties are set forth by state, not parish, law. See, e.g., La. R.S. §§ 47:1324, 1903, 1956-57, 1993.[11] Phillips was not an officer of the parish as a matter of law.

---

dissent, the dissent completely miscomprehends the thrust of the majority's opinion. We simply apply the statute to the facts of this case in trying to determine whether Phillips was an "agent" within the meaning of the statute. The statute also covers various conduct based on a defendant's status as an employee, partner, director, officer, manager or representative of the organization receiving federal funds, which may or may not require some relationship to the organization's funds. In the case before us, however, as we have noted above, the question of agency status under § 666 ultimately becomes whether there was any relationship between the tax assessor's office and the parish funds. In sum, our opinion does not address the various forms of conduct that can affect the integrity of federal funds.

[11]We are aware that Phillips declared himself a parish officer, but his personal declaration cannot override state constitutional and statutory authority to the contrary. Furthermore, whether he personally declared himself an officer of the parish is insignificant because a self-declared title has no bearing on his ability to control parish funds or to bind the parish in any way.

Moreover, the activities of the assessor are supervised by the Louisiana Tax Commission, a state board controlled by state officials. See La. R.S. § 47:1831-37. Indeed, the cover story for hiring Newman was the supposed need for extra help in complying with state law and regulations governing property reassessment. The prosecution never challenged that the assessor's duties are driven by state law and the state tax commission, and that the parish has no control over the assessor.[12]

We further note that the assessor's salary is not set by the parish, the salary is not paid for by the parish, and the assessor receives no employee benefits from the parish. The assessor's office has a separate retirement system and health and life insurance benefits. See La. R.S. §§ 11:401-83. The tax assessor's office receives no federal funds, and, in fact, is almost wholly self-funded by a tax millage.[13]

_____

[12]We note that under standard agency principles, the ability to control an individual is a necessary element in any agency relationship. See Restatement of Agency (2d), § 1. The dissent regards agency principles as "irrelevant" because it is possible to construe Phillips as an individual "authorized [by the state] to act on behalf of the parish." We do not disagree, given the unlimited breadth of the statute, that this reading is possible. Such a reading, however, is contrary to the legislative history, our precedent, and the case law from the Supreme Court and our sister circuits. A reasonable application of the statute precludes the senseless conclusion that an individual can be an agent of one who exercises no control, direct or indirect, over that individual.

[13]It is true that tax assessor geographical districts, with one exception, are coterminous with the territory of each parish and

15

As the assessor's office is statutorily and practically removed from the parish government, so too is the reverse true. There is nothing in the record to indicate that Phillips had any ability to control or administer employees or programs or funds of the parish. He had no legal authority to bind the parish. There

that the assessor is voted into office by the electors of the parish. It is also true that the taxes raised from the assessment district go to the parish. These connections, however, do not make Phillips an agent of the parish for purposes of § 666 when he has no connection with any funds of the parish and when the parish has no control over him, either directly or indirectly. Moreover, state law requiring the parish to provide office space, furniture, and utilities illustrates the independence of the assessor as this provision would be unnecessary if the assessor's officer were a part of the parish government. See La. R.S. § 33:4713.

In an effort to meet the "nexus" requirement, the dissent leans heavily on the hypothetical possibility that Phillips's fraudulent payments to Newman put the parish at risk of making up any shortfall resulting from the malfeasance of the assessor's office. The government, however, never suggested or established at trial that this was a possibility. More importantly, the fraud must have the potential to affect the identified federal funds or program. See, e.g., Fischer, 2000 WL 57430, *9 ("The Government has a legitimate and significant interest in prohibiting financial fraud or acts of a bribery being perpetrated upon Medicare providers. Fraudulent acts threaten the program's integrity. They raise the risk participating organizations will lack the resources requisite to provide the level and quality of care envisioned by the program."). There is nothing here that even remotely approaches the threat identified in Fischer. Even if the parish had needed to assist the assessor's office financially, there is nothing in this record to show that this could have affected the integrity of the food stamp program. Furthermore, the record utterly fails to establish that the funds fraudulently paid to Newman were "owned by, or . . . under the care, custody, or control of [the parish]," as required in subsection (a)(1)(A)(ii) of the Act. Finally, the dissent admits that we have extended § 666 liability no further than to those "who may administer federal funds." Marmolejo, 89 F.3d at 1192.

16

is a complete absence of any relationship between the food stamp issuing office and the assessor's office. In sum, because Phillips, as a matter of law, was not an employee or officer of the parish and because he was not authorized to act on behalf of the parish with respect to its funds, Phillips's actions did not and could not have threatened the integrity of federal funds or programs.[14] Without an agency relationship to the recipient of

---

[14]In close parallel to our analysis, § 666 has been construed to require that the recipient organization must be affected by the fraud. See, e.g., United States v. Fischer, 168 F.3d 1273, 1276 (11th Cir. 1999) ("The statutory prerequisite for a conviction under 18 U.S.C. § 666 is that the organization or agency affected by the fraud . . . 'receives . . . benefits in excess of $10,000 . . . .'") (emphasis added); United States v. LaHue, 998 F.Supp. 1182, 1190 (D. Kansas 1998) ("[S]ection 666 jurisdiction does not reach beyond the target recipient of the pertinent federal program.").

This requirement squares with the legislative history and the plain language of the statute. See e.g., United States v. Zwick, 199 F.3d 672, 1999 WL 1201443, *9 (3d Cir. Dec. 15, 1999) ("The legislative history of § 666 explains that the statute was enacted to correct deficiencies in existing law by 'creat[ing] new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies . . . .'") (citing S.Rep. No. 98-225, 369-70) (alteration in original); United States v. Coyne, 4 F.3d 100, 110 n.1 (2d Cir. 1993) ("With regard to theft, the Committee Report states that it must be 'from a [federally funded] program.' With regard to bribery, the Committee Report states that the conduct of the recipient of the bribe must be 'related to the administration of [a federally funded] program. It also states that the conduct sought to be influenced by the bribe must be 'related to the administration of the [federally funded] program.'") (citations omitted; alterations in original). Again, the government never contended that the funds of St. Helena Parish were affected by Phillips's and Newman's fraud. This is not to say, however, that the illegal conduct must affect the federal funds directly. It need not. See Salinas, 118 S.Ct. at 475; Westmoreland, 841 F.2d at

17

federal funds, § 666 does not reach the misconduct of local officials.

3

Our analysis and holding today is consistent with our previous observation that "[a]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, *there must be some nexus between the criminal conduct and the agency receiving federal assistance*." Moeller, 987 F.2d at 1137 (emphasis added).[15] Although we have not elaborated on this statement, the Supreme Court has suggested, as we have observed

_____

576-78.

[15]The dissent asserts that the relationship in Moeller cannot be distinguished from the relationship here, arguing that the Texas Federal Inspection Service ("TFIS") is a stand-in in this case for the tax assessor's office and the Texas Department of Agriculture ("TDA") is a stand-in for the parish. We disagree that the relationships are indistinguishable. The relationship between TFIS and TDA included joint supervision over employees, the enforcement of TDA regulations by TFIS employees, and a cooperative agreement between the two entities. Here, the tax assessor's office was independent of the parish. The parish exercised no control or supervision over the tax assessor's office or its employees. The tax assessor's office enforced state law, not parish law. Furthermore, the service that the tax assessor's office provided the parish resulted from the mandate of state law, not from an agreement between the parish and the assessor's office. Consequently, the factors that allowed the court to find an agency relationship in Moeller cannot be found in this record. Nor is there any comparable relationship to the facts in Westmoreland or Marmolejo. Thus, the dissent's conclusion that "we have already decided the statutory question before us contrary to the majority opinion" is incorrect.

18

earlier, that the statute might require just such a nexus or connection between a bribe or kickback and the expenditure of federal funds. <u>Salinas</u>, 118 S.Ct. at 474. In a similar vein, the Second Circuit had held that "the assessment of the thing's value must be connected, even if only indirectly, to the integrity of federal program funds." <u>United States v. Foley</u>, 73 F.3d 484, 490 (2d Cir. 1996).[16] So too has the Third Circuit required this connection. <u>See</u> <u>Zwick</u>, <u>supra</u>, 1999 WL 1201443, *11. <u>But see</u> <u>United States v. Dakota</u>, 188 F.3d 663 (6th Cir. 1999) (dismissing nexus requirement argument without discussion). The absence of this "nexus" or "connection" thus reinforces our conclusion that Phillips was not an agent of a recipient of federal funds for purposes of § 666.

4

Finally, we should observe that our construction of the statutory term "agent" is an appropriate method for deciding this case because the convictions on these facts raise troubling constitutional issues, which we would otherwise have to address.

---

[16]The Second Circuit has reaffirmed the post-<u>Salinas</u> validity of <u>Foley</u>. <u>See</u> <u>United States v. Santopietro</u>, 166 F.3d 88, 93 (2d Cir. 1999) ("[T]o the extent that <u>Foley</u> requires at least some connection between the bribe and a risk to the integrity of the federal funded program, nothing in <u>Salinas</u> disturbs such a requirement. . . . Thus, even after <u>Salinas</u>, <u>Foley</u> would not permit the Government to use section 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector just because the city's parks department had received a federal grant of $10,000.").

19

Congress' authority to enact § 666 rests on the Spending Clause of the Constitution. See U.S. Const., art. I, § 8. Though broad, the power of Congress to impose duties on non-federal entities under the Spending Clause is not without limits. See South Dakota v. Dole, 483 U.S. 203, 207 (1987) (citation omitted). The Court has stated: "[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" Id. (citations omitted). This § 666 prosecution of local government corruption advances no federal interest in safeguarding a particular federal program because the assessor's office has absolutely no connection with the administration of the food stamp program administered by St. Helena Parish.[17] Our approach is thus consistent with the principle of statutory construction that favors the avoidance of constitutional questions.[18]

---

[17]See, e.g., Zwick, 1999 WL 1201443, *8 ("The most literal interpretation--that the statute lacks a federal connection requirement--is troubling from an interpretative standpoint in that it broadens the range of activity criminalized by the statute and alters the existing balance of federal and state powers by encompassing acts already addressed under state law in which the federal government may have little interest."). See also George D. Brown, Stealth Statute-Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666, 73 Notre Dame L.Rev. 247, 257, 266, 312 (1998).

[18]See, e.g., Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 1222 (1999) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.")(citations omitted);

In sum, the absence of any federal interest in this prosecution militates in favor of our analysis that the statutory term "agent" should not be given the broadest possible meaning, as urged by the government, but instead should be construed in the context of § 666 to tie the agency relationship to the authority that a defendant has with respect to control and expenditure of the funds of an entity that receives federal monies. For the reasons we have stated, the convictions of count four of the indictment, charging a violation of 18 U.S.C. § 666 with respect to Newman's employment by Phillips, are reversed and vacated.

IV

We now must consider the impact of our reversal of the § 666 convictions on counts 5 through 14 of the indictment, which charge both Phillips and Newman with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). This section makes it a crime for one who

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such

United States v. Castillo, 179 F.3d 321, 328 n.10 (5th Cir. 1999), cert. granted, 120 S.Ct. 865 (U.S. Jan 14, 2000) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [a court] . . . will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (alteration in original)(citing New York v. United States, 505 U.S. 144, 170 (1992)). We do not think that this federalism concern can be dismissed, as would the dissent, as a mere "policy matter."

21

a financial transaction <u>which in fact involved the proceeds of a specified unlawful activity</u> . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

(Emphasis added.)

Counts 5 through 14 of the indictment charge Phillips and Newman with conducting financial transactions on each occasion that Philips issued Newman a payroll check from the assessor's office in the 1995 scam; that is, each check constitutes a separate count. Specifically, with respect to each of the ten checks the indictment charged that Phillips and Newman

knowingly conducted . . . financial transactions . . . namely, issuance and transfer to defendant Newman . . . checks drawn on the Assessor's Office account at the Bank of Greensburg, <u>which financial transactions involved the proceeds of specified unlawful activity, namely, theft in connection with a federally funded program in violation of Title 18, United States Code, Section 666</u>, knowing the transactions were designed . . . to conceal the nature . . . of the proceeds of said specified unlawful activity and <u>knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity</u>.

(Emphasis added.) Each of the ten checks constituted a separate count of the indictment.

Thus, because it has failed to prove that the financial transactions involved proceeds in violation of § 666, the government clearly has not proved every allegation of these money laundering counts. The question, however, is whether the

22

government has proved every <u>essential</u> element of these counts so that the convictions under these counts survive our holding that these funds had no connection with a federally funded program in violation of Section 666. <u>See, e.g.</u>, <u>United States v. Gabel</u>, 85 F.3d 1217 (7th Cir. 1996) (holding that there is no requirement that the government link the money laundered to a specific criminal act).

Our circuit does not seem to have decided the express question of whether the government must prove the precise corrupt source of the funds as alleged in the indictment, <u>see, e.g.</u>, <u>United States v. Alford</u>, 999 F.2d 818 (5th Cir. 1993), and we find it unnecessary to decide the question today. We will assume that it was not necessary for the government to prove, as alleged in the indictment, that the funds resulted specifically from the specified unlawful activity of theft in connection with a federally funded program in violation of § 666.

In a prosecution under § 1956(a)(1)(B)(i), the government must prove that the defendant knew only that the property represented proceeds derived from "some form of unlawful activity." It is clear that the government proved this characteristic of the proceeds and the defendant's knowledge of the same. At the same time, however, it is clear that the statute requires that the government also must prove that the funds "in fact" involve "the

23

proceeds of specified unlawful activity." This term is not to be applied as it might be generically defined. Section 1956 appears in the racketeering chapter of the criminal code and the statute is aimed, not at all illegally obtained property, but only at property that Congress concluded served the purpose of the racketeering statutes. It is, therefore, not surprising that § 1956(c)(7) specifically defines, and gives restricted meaning to, the term "specified unlawful activity." As relevant to this case, Section 7(D) defines "specified unlawful activity" to include, among many other federal crimes, theft concerning programs receiving federal funds in violation of § 666. Among the other federal crimes defined as "specified unlawful activity," the only other enumerated crime that could possibly relate to the funds in this case is mail fraud.

In sum, the convictions under counts 5 through 14 could only survive if the government proved that the financial transactions alleged and charged in these counts were proceeds from either theft in connection with a federally funded program or proceeds in connection with mail fraud. The government has proved neither. First, we have held in the preceding section of this opinion that no funds in this case involve proceeds in connection with a federally funded program. Second, there is no evidence before us that the checks alleged in counts 5 through 14 were ever

24

transmitted in the mail. To the extent that the record indicates the method of delivery of these checks, it was hand-delivery. And, finally, the government makes no argument that the proceeds involved in the transactions alleged in counts 5 through 14 had any connection with mail fraud. Therefore, each of the convictions under counts 5 through 14 are reversed for failure to prove an essential element of those alleged money laundering offenses, to wit, that the transactions involved funds from a "specified unlawful activity."[19]

V

---

[19]Because we reverse these convictions on the grounds stated above, we do not reach the merits of the appellants' argument that the district court erred in admitting a tape made by Newman's second wife, Katie. This tape contained an admission by Newman--deemed by the government as significant--that his 1995 employment was a fraud. On appeal, Newman argues that the tape should have been excluded from evidence based on the spousal communications privilege, and that the error in admitting it was not harmless. The district court admitted the tape on the grounds that the Newmans, at the time the tape was made, were separated and in the process of becoming divorced, and that under these circumstances, the marital relationship had ended and Newman was not entitled to claim the spousal communication privilege. The record here, however, shows that there was no permanent irreconcilable separation at the time Katie made the tape; indeed, there was a reconciliation that lasted several months after the tape was made. The relationship, therefore, was not "moribund" or "as a social fact had expired." United States v. Cameron, 556 F.2d 752, 756 (5th Cir. 1977). Although we have not clearly spoken on the impact of a marital separation on this privilege, it does seem that the better rule requires the district court to inquire into the nature of the separation before deciding whether to apply the privilege. See, e.g., United States v. Roberson, 859 F.2d 1376, 1381 (9th Cir. 1988); In re Grand Jury Witness, 791 F.2d 234, 238-39 (2d Cir. 1986).

We next turn to consider count three of the indictment, which charges both Newman and Phillips with engaging in an illegal monetary transaction under 18 U.S.C. § 1957 with respect to the negotiation of the $15,000 life insurance check received by Newman upon the death of his first wife, Jean. Here, the indictment charges that specified unlawful activity from this check was derived was the mail fraud charged in count two, a count on which we uphold the convictions.

Phillips argues that the evidence at trial was insufficient to support his conviction. This count relates to the 1992 scheme. We find no merit here. Although Phillips personally may not have cashed Newman's $15,000 life insurance check, he underwrote each step necessary to Newman's ability to obtain that check. Phillips provided and certified the documentation necessary to obtaining this benefit. Moreover, Phillips placed Jean on the payroll and thus made Newman eligible for this benefit. Thus, he aided and abetted the fraudulent payment of this money. See United States v. Anderson, 174 F.3d 515, 523 (5th Cir. 1999). Under our case law, Phillips has more than sufficient connection to the illegal transaction. See United States v. Hemmingson, 157 F.3d 347, 355 (5th Cir. 1998) (citing United States v. Willey, 57 F.3d 1374, 1383 (5th Cir. 1995)). Alternatively, Phillips is guilty under the "Pinkerton" liability theory, in that Newman's actions were a

26

reasonably foreseeable consequence of their scheme even if as a co-conspirator he did not participate in the substantive crime. See Pinkerton v. United States, 328 U.S. 640, 645 (1946); United States v. Dean, 59 F.3d 1479, 1490 n.20 (5th Cir. 1995). Given reasonable foreseeability, Pinkerton liability requires only that the substantive crime be "committed by a coconspirator in furtherance of a conspiracy." United States v. Jensen, 41 F.3d 946, 955-56 (5th Cir. 1994) (citation omitted). That standard is met here.

VI

Newman alone was charged with and convicted for perjury (count fifteen). He challenges for insufficiency of evidence. The perjury charge stemmed from Newman's testimony to the grand jury concerning Phillips's account at his hardware store. Specifically, Newman was asked whether he brought to the grand jury "any records showing payments by Mr. Phillips on his account, or payments by the Assessor's Office on any account?" Newman responded by describing how he would credit Phillips's account at the hardware store with the amount of the paychecks he received from Newman because he owed Phillips about $4000 for a horse he purchased from Phillips. When asked "[s]o you paid on his account in payment of the horse?", Newman responded "[u]m-hm, part of it, not all of it." Newman now claims, in essence, that the government failed to prove beyond a

reasonable doubt that his story concerning the purchase of the horse was false.

As the government argues, the lack of any supporting evidence that the sale of a horse occurred allows the jury to discredit Newman's story and conclude that the testimony explaining the reason why Newman credited Phillips's account was false. Phillips never transferred the horse's title papers to Newman's name; Newman never took over caring for the horse; Newman did not name the horse; Phillips failed to report income from the sale of the horse until after the investigation began; and Phillips never reported to his partner the sale of the horse to Newman. Given our standard of review, this evidence is amply sufficient to support the verdict.

VII

We find no merit to the remaining issues on appeal.[20]

A

First, we consider whether the trial court abused its discretion in admitting, under the co-conspirator exception, the hearsay testimony of Mala Schott relating to statements made by

---

[20]It is not necessary to discuss Phillips's argument that the district court erred in denying his motion to sever. His point regarding the introduction of the Katie Newman tape, his principal argument, is moot. Evidence of the horse sale and Schott's testimony would have been admissible in a separate trial.

Jean Newman regarding her employment with the assessor's office.[21] This evidence relates only to the 1992 insurance scam.

Schott is the eldest daughter of Emerson and Jean Newman. She testified at trial that her mother indicated to her directly and indirectly, on several occasions, that neither she nor her father performed any work for the assessor's office, and that they were, in fact, cheating the government. Again, these statements all pertained to the 1992 and earlier "employment." Schott testified that she heard her father term the arrangement "his best scam" (an admission against interest of the defendant) and that her mother had admitted to her that the only reason she was on the payroll of the assessor's office was to receive insurance benefits. Schott witnessed her father making a cash payment to Phillips when Phillips delivered Jean's paycheck. Schott asked her mother what the payment was all about. Upon this questioning from her

---

[21]"[T]his court reviews admission of hearsay evidence under the non-hearsay definition of Rule 801(d)(2)(E) for abuse of discretion." United States v. Cornett, 195 F.3d 776, 1999 WL 1021232 (5th Cir. 1999) (citing United States v. Narviz-Guerra, 148 F.3d 530 (5th Cir. 1998)). The proponent of admittance under Rule 801(d)(2)(e) must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy. See United States v. Broussard, 80 F.3d 1025, 1038 (5th Cir. 1996) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).

daughter, Jean explained the scheme and asked that Schott help keep the secret. Specifically, Schott stated:

> She told me again to keep it secret because she didn't want me to blow the lid on the situation. . . . And she didn't want me getting in a confrontation in front of [Newman] or in front of a customer, and someone finding out about the deal, and subsequently, her losing her health insurance.

Based on this conversation, and her mother's references to Phillips as her "guardian angel," Schott testified she knew this was a kickback scheme. She additionally testified that she said to her mother that "it looked like [her father] knew exactly what he was doing" in giving Phillips cash when he came to deliver Jean's paycheck. Schott then testified: "And [Jean] told me that daddy had already figured it out, that whatever the amount of the [Jean's] check was, he wouldn't give Chaney the complete amount back. He withheld some of the check back so that at the end of the year he wouldn't have to pay taxes on that money." Again, this statement implicated Jean in the scheme and was confided in Schott in an effort to keep her from disclosing its operation.

The government offered proof of the existence of a conspiracy of which Jean was a member, and the statements were made during the course of the conspiracy. The "in furtherance" of a conspriracy standard is well established. This Court has "consistently held that the 'in furtherance' requirement is not to be construed too strictly lest the purpose of the exception be defeated." Cornett,

30

1999 WL 1021232 at *4.  Generally, however, "a statement is not in furtherance of the conspiracy unless it advances the ultimate objects of the conspiracy."  Id.

Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.  See Forman v. United States, 361 U.S. 416 (1960); United States v. Diez, 515 F.2d 892, 897-98 (5th Cir. 1975).  Because Jean attempted to explain to her daughter the nature of the conspiracy in an effort to exact sympathy so that the scheme could remain a secret, the statements were undoubtedly made "in furtherance" of the conspiracy, and as such were properly admitted.

B

The trial court did not abuse its discretion in refusing to apply the residual exception to the hearsay rule, Fed. R. Evid. 807,[22] to admit exculpatory statements made by Jean Newman to her friend Margaret Carter that she was working for the assessor's

_____

[22]In relevant part, Rule 807 states: "A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

31

office.[23]  If allowed to testify, Phillips and Newman contend that Carter would have testified that one day, while in the hardware store, she noticed Jean working with several pieces of paper.  When Carter inquired about the nature of the paperwork, Jean allegedly responded that she was working on a project for Phillips that had something to do with land.

The passing comment made by Jean concerning her employment is arguably vague.  It may be correct that Jean would have no reason to lie in making a passing comment to a casual acquaintance concerning the nature of any paperwork she was doing.  It may also be correct, however, that Jean's motivation to lie--her desire to maintain the favorable status of her pseudo-employment for the purpose of receiving health coverage--was so strong that any

---

[23]The exception is to be "used only rarely, in truly exceptional cases." United States v. Thevis, 665 F.2d 616, 629 (5th Cir. 1982).  "[T]he proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force." United States v. Washington, 106 F.3d 983, 1001-02 (D.C. Cir. 1997).  "[I]n order to find a statement trustworthy, a court must find that the declarant of the . . . statement 'was particularly likely to be telling the truth when the statement was made.'" Id. (citing United States v. Tome, 61 F.3d 1446, 1453 (10th Cir. 1995)).  Given this high hurdle, in the decision as to whether to apply the residual exception "district courts are given 'considerable discretion,' and a court of appeals will not disturb the district court's application of the exception 'absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'" United States v. Loalza-Vasquez, 735 F.2d 153, 157 (5th Cir. 1984) (quoting Page v. Barko Hydraulics, 673 F.2d 134, 140 (5th Cir. 1982)).

statements made concerning her supposed employment with the assessor's office cannot be trusted. Regardless of which option seems more persuasive, neither presents a "definite and firm conviction the [district] court made a clear error of judgment in the conclusion it reached." Id. As such, this ruling should not be disturbed.

C

Furthermore, the trial court did not abuse its discretion in allowing testimony concerning the vote-buying scheme under Rule 404(b).[24] Evidence of extraneous acts under Rule 404(b) is admissible only if: (1) it is relevant to an issue other than the defendant's character, and (2) the evidence's probative value is not substantially outweighed by its undue prejudice. See United States v. Leahy, 82 F.3d 624, 636 (5th Cir. 1996).

The district court admitted this evidence because it showed both an intent on the part of Phillips and Newman to defraud the public and because it established another motive for Phillips to assist Newman in obtaining health insurance even though the vote

---

[24]Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

33

buying occurred later.  As Phillips denied accepting kickbacks in the insurance scheme, the reason why Phillips would place the Newmans on the assessor's payroll had to be explained.  The district court found that the relationship between the parties was a critical issue, and this extrinsic evidence was relevant in establishing the motives behind their interactions over time. Thus, Phillips's ability to obtain Newman's assistance in Phillips's political activities helped to explain why Phillips would place Newman on the payroll--even though the mutual favors may not have been associated in the same time frame.  These rulings do not constitute an abuse of discretion.

Nor does admission of this evidence seem to violate the second requirement, that the evidence be more probative than prejudicial. In United States v. Beechum, 582 F.2d 898, 915 n.20 (5th Cir. 1987), we stated that exclusion is warranted "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence."  On these facts, the exclusion does not apply.[25]

---

[25]Finally, we note that Newman argues that the district court erred in revoking Newman's indigency status and requiring him to pay funds into the registry of the court to cover the costs of his representation.  Newman's claim is presented cursorily at best.  We bear no responsibility to review claims presented summarily without

34

VIII

We now turn to the sentencing issues.  Because we have vacated a substantial number of the appellants' convictions and sentences, and because the sentences were confected in groupings based on fraud or money laundering, and in the light of the convictions as a whole, we vacate the entire sentence on each of the defendants and remand for resentencing on the counts that remain.

We should, however, make it clear that we have reviewed Phillips's argument that the district court erred when it gave a four-point upward departure on grounds that Phillips was an organizer or leader of a criminal activity under USSG § 3B1.1(a). On the "fraud convictions" that remain (counts one, two, and sixteen through twenty), we can find no error in the district court's finding that Phillips organized a fraud involving five or more participants.  The district court found, we think correctly as both a matter of law and fact, that those participants included Phillips, Newman, Jean Newman, Patricia Easley, Laura Bankston, Kari Carter, and David Albin.

We hold, however, that the upward departure on the remaining "money laundering" conviction, count three, the 18 U.S.C. § 1957 conviction for engaging in an illegal monetary transaction, was in

---

argument.  Without explanation, argument, or authority, nothing is presented for review.  See Nichols v. Scott, 69 F.3d 1255, 1287 n.67 (5th Cir. 1995).

35

error.  To reach five participants, the district court had to count Katie Newman as one of the five.  Katie Newman, alleged to have deposited one of Newman's 1995 paychecks had no role in this offense occurring in 1992, and thus may not be counted as one of the five participants.  Eliminating her leaves only four participants, and thus necessitates a reversal of the four-level upward departure on this count.

IX

In sum, we REVERSE and VACATE the convictions of Phillips and Newman on the 18 U.S.C. § 666 count (count four) because Phillips was not an agent of St. Helena Parish for purposes of § 666.  The money laundering counts (counts five through fourteen), charged under 18 U.S.C. § 1956, are  reversed because the government has failed to prove that any of the transactions involved proceeds from any "specified unlawful activity."  We AFFIRM the convictions of Phillips and Newman for conspiracy to violate the mail fraud statute, for committing mail fraud and for illegal monetary transactions (counts one through three).  We AFFIRM the conviction of Newman for perjury (count fifteen).  We affirm Phillips's convictions for mail fraud with respect to the "clothing" scheme (counts sixteen through twenty).  We VACATE the sentences as to all convictions to allow the district court to resentence in the light of this opinion.  Accordingly, we

36

AFFIRM in part, REVERSE in part, and REMAND for resentencing in the light of this opinion.ENDRECORD

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority opinion insofar as it upholds appellants' convictions and sentences. However, the majority vacates several convictions premised on violations of 18 U.S.C. § 666 because, in its view, Chaney Phillips, St. Helena Parish's Tax Assessor, was not an "agent" of St. Helena Parish ("the Parish"). Because the statutory definition of "agent" clearly encompasses the position of Tax Assessor, and because our precedent dictates an outcome contrary to the majority opinion, I disagree. Accordingly, I dissent in part.

Section 666 provides, in relevant part, that:

Whoever . . . being an agent of an organization, or of a state, local, or Indian tribal government, or any agency thereof [which receives benefits in excess of $10,000 under a federal program]))

  (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that))

    (I) is valued at $5,000 or more, and
    (ii) is owned by, or is under the care . . . or control of such . . . agency

shall be fined under this title, imprisoned not more than ten years, or both.

18 U.S.C. § 666. As this language makes clear, all that is relevant in determining whether a defendant has violated § 666 is: (1) whether a local body receives more than $10,000 under a federal

program, (2) whether the defendant is an "agent" of the body, and (3) whether the defendant "embezzles, steals, [or] obtains by fraud" funds of the body. *See United States v. Moeller*, 987 F.2d 1134, 1137 (5th Cir. 1993) ("There are only two requirements necessary to bring a defendant within section 666. First, the defendant must be an agent of a government agency which receives in excess of $10,000 from the federal government within a one year period. Second, the defendant must engage in conduct proscribed by section 666(a)(1)(A) or (B).").

It is undisputed that St. Helena Parish received more than $10,000 in federal benefits—funds from the federal food stamp program—and the jury found that Phillips embezzled, stole, or obtained by fraud thousands of dollars "belonging to and under the care, custody and control of the Parish."[26] Phillips is thus guilty of violating § 666 if he is an "agent" of the Parish, which the statute defines as "a person authorized to act on behalf of [the Parish] . . . includ[ing] a servant or employee, [or] a partner,

---

[26] Though the majority contends that the record "utterly fails to establish" that the funds fraudulently paid to Newman were owned by, or under the care, custody, or control of the Parish, neither appellant challenges this finding on appeal. Nor, as the majority admits, does either appellant challenge whether the federal food stamp funds received by the Parish are the type of "benefits" intended by the statute. *See Fischer v. United States*, –U.S.–, 120 S. Ct. 1780, __ L. Ed. 2d __ (2000) (holding that medicare reimbursements given to health care providers constitute "benefits" as defined by § 666).

director, officer, manager, [or] representative."  18 U.S.C. §

666(d)(1).[27]

Phillips clearly falls within this definition in at least two

ways.  First, there is no doubt that, at least in some respects,

Phillips is "authorized to act on behalf of" the Parish.  The

district court held that "[t]he assessor's primary function is to

assess the value of real property within the parish for the parish

ad valorem property tax.  In performing those duties, he is clearly

acting as an agent of the parish." *United States v. Phillips*, 17

F. Supp. 2d 1016, 1017-18 (M.D. La. 1998).  The majority does not

challenge this finding; rather, it asserts that "the question is

whether Phillips was authorized to act on behalf of the Parish *with*

*respect to its* [federal] *funds*."  However, as described below, this

specific nexus—between Phillips and the federal funds inside Parish

---

[27]     Because § 666 specifically defines the term "agent" for purposes of the statute, the "standard agency principles" noted by the majority are simply irrelevant.  We must interpret § 666(d) as written, and cannot use hornbook agency principles to restrict the broad definition of "agent" that Congress provided. Even if we did so, furthermore, the results would be unavailing.  The majority's description of Louisiana law combined with its use of "standard agency principles" appears to make the tax assessor an "agent" of the state.  Appellants do not make this argument, however, as it is virtually certain that the state receives far more than the requisite $10,000 in federal funding.  Appellants sole possibility for avoiding § 666 liability is if the assessor is an agent of the St. Helena Parish Tax Assessment District *only* and no other body of local government.  As described below, the statute and our precedent preclude this limiting definition.

40

coffers—is not required.  There is no dispute that, to fulfill his duties in ascertaining the proper amount of property taxes residents must pay to the Parish, Tax Assessor Phillips is "authorized to act on behalf of" the Parish.  Under a plain reading of the statute, our inquiry should end there.  *See United States v. Westmoreland*, 841 F.2d 572, 576 (5th Cir. 1988) ("Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language.  Only the most extraordinary showing of contrary intentions in the legislative history will justify departure from that language.") (citations omitted).

Phillips also falls within the § 666 definition of "agent" because he is an "officer" of the Parish as defined by Louisiana law.[28]  *See* 18 U.S.C. § 666(d)(1) (defining "agent" as, *inter alia*, an "officer" of the governmental body).  The Louisiana Constitution itself includes tax assessors in a provision defining "Parish

---

[28]     Section 666 does not define the term "officer."  However, the expansive statutory definition of "agent"))including, *inter alia*, an "employee, partner, manager, officer, [or] representative" of the agency))recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement.  Therefore, to broadly protect the integrity of federal funds given to an agency, § 666 applies to any individual who represents the agency in any way, as representing or acting on behalf of an agency can affect its funds even if the action does not directly involve financial disbursement.  There is no authority in the text of § 666, legislative history, or caselaw to support the majority's holding that the tax assessor cannot be an officer of the Parish because his duties and responsibilities are defined by state law.

41

Officials." *See* LA. CONST., art. 6, § 5(G) ("*Parish Officials* and School Boards Not Affected. No home rule charter or plan of government shall contain any provision affecting a school board or the offices of district attorney, sheriff, *assessor,* clerk of a district court, or coroner, which is inconsistent with this constitution or law.") (emphasis added). Various Louisiana statutes reach the same conclusion. For example, LA. R.S. § 13:5108 provides that the state will indemnify "officials, officers, and employees of the state," exempting from this provision "parish officials set forth and named in Article VI, Sections 5(G) and 7(B) of the Constitution." LA. R.S. § 13:5108.2A(2). As § 5(G) of the Louisiana Constitution includes parish tax assessors, the statute unambiguously identifies tax assessors as officers of the Parish, and thus "agents" of the parish for § 666 purposes.

In applying the broad definition of "agent" provided in § 666(d) to avoid constitutional problems, our precedents require "some nexus between the criminal conduct and the agency receiving federal assistance." *Moeller*, 987 F.2d at 1137. We do not require the criminal conduct to necessarily, or even potentially, affect the particular funds within the coffers of local government which have been provided by a federal source. Nor do we require the government to prove a distinct federal interest in protecting the

42

particular funds stolen by a defendant.[29]  Rather, for § 666

liability to attach, it is sufficient that the criminal conduct

affect the agency receiving federal assistance; in essence, we have

determined that there is an inherent federal interest in insuring

[29]     As the majority notes, several of our sister circuits
have required the government to prove that a federal interest is
implicated by the defendant's conduct to constitutionally allow a
conviction under § 666.  *See United States v. Zwick*, 199 F.3d 672,
687 (3d Cir. 1999) ("[W]e hold that 666 requires that the
government prove a federal interest is implicated by the
defendant's offense conduct."); *United States v. Santopietro*, 166
F.3d 88, 93 (2d Cir. 1999) (noting that it "would not permit the
Government to use section 666(a)(1)(B) to prosecute a bribe paid to
a city's meat inspector in connection with a substantial
transaction just because the city's parks department had received
a federal grant of $10,000").  However, as described above, "[t]he
Fifth Circuit [has] contrasted its own position, expressed in
*Westmoreland*, that the statute does not require any relation
between the $5,000 thing of value and the federal funds received by
the local agency."  *Santopietro*, 166 F.3d at 91.  Admittedly, the
Supreme Court's decision in *Salinas v. United States*, 118 S.Ct. 469
(1997) "may be read to indicate that the threat to the integrity
and proper operation of a federal program created by the corrupt
activity is necessary to assure that the statute is not
unconstitutionally applied."  *Santopietro*, 166 F.3d at 91.
However, as the Second Circuit noted in *Santopietro*, *Salinas* did
not dispute our decisions in *Westmoreland* and *Marmolejo*; rather, it
expressly reserved the question of whether "the statute requires
some other kind of connection between a bribe and the expenditure
of federal funds."  *See Santopietro*, 166 F.3d at 91 (citing
*Salinas*, 118 S.Ct. at 474).  We are thus bound, at least as a panel
of three judges, to our analysis in *Westmoreland* and its progeny.
*See Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir.
1999) ("It is a firm rule of this circuit that in the absence of an
intervening contrary or superseding decision by this court sitting
en banc or by the United States Supreme Court, a panel cannot
overrule a prior panel's decision.").  Circumventing those
decisions, which the majority opinion essentially does, is a matter
for this court to accomplish *en banc* if at all.

that agencies receiving significant amounts of federal funding are not corrupt. *See Westmoreland*, 841 F.2d at 577-78 ("It is sufficient that Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them."); *United States v. Marmolejo*, 89 F.3d 1185, 1193 (5th Cir. 1996) ("Any reference to federal funds is conspicuously absent from the operative provisions, allowing Congress to ensure the integrity of federal funds by protecting the integrity of the organizations that receive them."); *cf. Fischer*, 120 S. Ct. at 1787 (describing how § 666 "reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs").

The minimal nexus required—between Phillips's misconduct and the Parish itself—plainly exists here. Despite the fact that the assessor's office has created an "Assessment District" and is to some degree self-funded, Louisiana law provides that each Parish must provide "offices, furniture, and equipment" as well as utilities for the tax assessor's office and mandates that the "cost of such furniture and equipment . . . as may be needed by the tax collector and assessors of each parish shall be borne proportionately by all tax recipient bodies in the parish." LA.

44

R.S. § 33:4713.[30]  Therefore, despite the existence of an assessment

district, the tax assessor's office is to some extent funded by the

Parish; as the district court noted, "testimony at trial indicated

that the St. Helena Police Jury provided funding to the assessor's

office."  *Phillips*, 17 F. Supp. 2d at 1018.  Our previous cases

have extended § 666 liability to all those "who may administer

federal funds, regardless of whether they actually do," *United*

---

[30]     One  commentator  describes  how  the  expenses  of  the
Assessor's Office are provided for as follows:

> The cost of furniture, maps, and supplies needed by
> the tax assessors are borne proportionately by all taxing
> bodies in the parish under the traditional modus operandi
> of  Louisiana  parish  government.    These  items  are
> purchased by the parish governing body and billed to the
> other taxing bodies.
>      The  salaries  and  expense  allowances  of  parish
> assessors are enumerated in state statutes.  Each taxing
> body in a parish contributes a pro-rata share to payment
> of the assessor's salary and expenses in proportion to
> their percentage of the total ad valorem tax collection
> of  the  parish.    The  sheriff  remits  the  amounts  due
> directly to the assessor from the first taxes collected
> each year.
>      *Some relief* from payment of the assessor's office
> expenses  is  afforded  to  the  parish  governing  body  in
> those parishes where the assessor has availed himself of
> the  prerogative  to  finance  his  office  by  means  of  a
> millage levied on the assessed valuation of all property
> on the tax rolls of a statutorily created 'Assessment
> District.'

I. Jackson Burson, Jr., *Not Endowed By Their Creator: State
Mandated Expenses of Louisiana Parish Governing Bodies*, 50 LA. L.
REV. 635, 647 (1990) (emphasis added) (citations to various
provisions of the Louisiana code omitted).

*States v. Marmolejo*, 89 F.3d 1185, 1192 (5th Cir. 1996). Here, because the St. Helena Parish Tax Assessor "may" administer funds given to the Parish and provided by the Parish to the Assessor's Office, the connection between Phillips and the Parish is legally sufficient.

As a result, the majority overreaches when it claims that the conduct for which Phillips and Newman were convicted could not possibly affect the integrity of the federal funds contained within Parish coffers. Phillips paid Newman $800 per month from the tax assessor's office treasury for doing little or no work; in exchange, Phillips received a substantial credit against his account at Newman's hardware store. Because Phillips's criminal activity diminished the assessor's office coffers by $800 per month, and because the Parish was responsible by law to pay any deficit in the assessor's office budget, *see* LA. R.S. § 33:4713, Phillips's misconduct made it substantially more likely that Parish funds (including those received from the federal food stamp program) would be unnecessarily expended. In this respect, there was "some nexus between the criminal conduct and the agency receiving federal assistance." *Moeller*, 987 F.2d at 1137. Phillips's theft, by increasing the possibility that Parish funds would be unnecessarily used to fund the assessor's office, could have affected the integrity of the federal funds in Parish coffers.

Under our precedent, it is irrelevant that the program from which the Parish receives federal funding))the federal food stamp program))was not actually compromised. *See id.* ("The particular program involved in the theft of bribery scheme need not be the recipient of federal funds.").

The majority limits the definition of "agent" for § 666 purposes only to those "authorized to act on behalf of the Parish with respect to its [federal] funds" and exaggerates the separation between the Parish government and the tax assessor's office in part to avoid the "troubling constitutional questions" that the clear meaning of the statute raises. However, while the desire to avoid troubling constitutional problems with a statute is laudable, *see Jones v. United States*, –U.S.–,120 S.Ct. 1904, 1911, __ L.Ed.2d __, (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."), it is impossible to fulfill in this case because we have already decided the statutory question before us—whether the separation of federal food stamp funds from other funding in Parish coffers renders insufficient the connection between those federal funds and the Parish Tax Assessor's Office—contrary to the majority opinion. Our cases firmly establish (as a statutory and constitutional matter) that so long

47

as a defendant has the requisite agency relationship with the body of local government receiving the federal funds, § 666 covers his misconduct regardless of whether his particular conduct affected those funds in particular.[31]

A brief examination of *Westmoreland* and *Moeller* makes this clear.  In *Westmoreland*, a county supervisor took bribes in connection with her purchase of road and bridge-building materials for the county.  Federal jurisdiction under § 666 was premised on the county's receiving general revenue sharing funds from the federal government.  Westmoreland argued that because the federal funds received by the county "were segregated and not expended for the types of purchases she made," *Westmoreland*, 841 F.2d at 574, her conduct could not affect the integrity of the federal funds. We rejected that argument, reasoning that even if Westmoreland's authority did not extend to purchases using federal funds, "an agent violates subsection (b) when he engages in the prohibited conduct in any transaction or matter or series of transactions or

---

[31]     The majority argues that "the fraud must have the potential to affect the identified federal program" and that the government failed to prove that theft from Parish funds would necessarily implicate the funds from the food stamp program.  The government's failure to introduce such proof, however, is understandable because under our precedent, the fact that appellants' conduct could effect the funds of the Parish—regardless of its potential effect on the federal funds contained therein—is sufficient to meet the required nexus.

48

matters involving $5,000 or more *concerning the affairs of the local government agency*." *Id.* at 567 (emphasis added) (citation omitted). Under *Westmoreland*, conduct effecting the agency receiving federal assistance, irrespective of whether such conduct could effect that federal assistance, is sufficient to meet the nexus requirement.

Likewise, in *Moeller*, we considered whether employees of the Texas Federal Inspection Service (TFIS)—a joint federal-state agency without any federal funding—were "agents" of the Texas Department of Agriculture (TDA)—a Texas state agency with over $10,000 in federal funding—for § 666 purposes. While the majority points out several distinctions between the relationship we considered in *Moeller* and the connection between the Parish and the Parish Tax Assessor's Office, the relevant facts are virtually identical. There, TFIS employees merely enforced state produce regulations, and the money gathered as a result of those functions went directly into the state treasury. *Id.* at 1138. Here, Assessor's Office employees assess the value of real property within the Parish and, hence, determine how much money Parish residents will pay the Parish in the form of ad valorem property taxes. Employees of the tax assessor's office perform their jobs on behalf of the Parish, and such labor leads directly to the filling of Parish coffers. *Cf. Moeller*, 987 F.2d at 1138 ("TFIS

enforced regulations promulgated by TDA and the funds collected by those regulatory functions were remitted directly to the state treasury."). The distinguishing facts identified by the majority—that the powers and duties of the assessor's office are defined by state, rather than Parish, law—are of no consequence.

Phillips's crime, basically payroll fraud of a local government agency, may not be))as a policy matter))best prosecuted by the federal government in the federal courts.[32] However, as described above, the text of § 666 and the precedents of this court allow the federal government to prosecute this crime. While *Salinas* and its progeny potentially forecast that our literal application of the expansive "agent" definition provided by § 666 may some day be overruled, our precedent remains unaffected and clearly binds this Court to reject the analysis offered by the majority. Accordingly, I believe that the district court correctly applied *Westmoreland*, *Moeller*, and *Marmolejo* in upholding appellants' § 666 convictions. I dissent in part.[33]

---

[32] Contrary to the majority's remark, I do not dismiss the federalism concerns inherent in the interpretation of § 666 as a mere "policy matter." Simply, while important, federalism does not allow us to strictly construe this statute which, by its clear language, is "expansive both as to the conduct forbidden and the entities covered." *Fischer*, 120 S. Ct. at 1787 (citing *Salinas*, 522 U.S. at 56, 118 S. Ct. 469).

[33] As I would uphold the § 666 convictions, I would also uphold the money laundering convictions under 18 U.S.C. §

1956(a)(1) which are based in part on them. Further, as Katie Newman was indeed a participant in this illegal activity, Phillips's sentencing enhancement for being the leader or organizer of a criminal enterprise of five or more participants was not clearly erroneous. *See United States v. Boutte*, 13 F.3d 855, 860 (5th Cir. 1994) (holding that to count as part of the enterprise for purposes of the enhancement, individuals "need only have participated knowingly in some part of the criminal enterprise"). In short, I would uphold the district court in full.