REVISED, JANUARY 25, 2001

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 99-20188
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BEN T. REYES; ELIZABETH MALDONADO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
January 23, 2001

Before DUHÉ and PARKER, Circuit Judges, and FOLSOM,[*] District Judge.

DAVID FOLSOM, District Judge:

     After a three-month-long trial, Appellants-Defendants Ben T. Reyes and Elizabeth ("Betti") Maldonado (hereinafter "Reyes" and "Maldonado" respectively) were convicted of bribery and conspiracy to commit bribery and Reyes of mail fraud.  Reyes and

_____

     [*]     District Judge of the Eastern District of Texas, sitting by designation.

Maldonado appeal their convictions and the sentences that followed. We find no error as to either defendant and therefore affirm the district court's rulings in all respects.

## I. FACTUAL BACKGROUND

In August 1995, the FBI instituted a sting operation in connection with its investigation into allegations of official wrongdoing by Houston city councilman Ben Reyes. The allegations centered on charges by Berta Flores--Reyes's "political enemy" and a paid informant to the FBI--that Reyes had received kickbacks on city contracts. The centerpiece of the FBI's operation was a fictitious corporation dubbed the "Cayman Group." The Cayman Group was purportedly interested in investment opportunities in hotels, resorts, and real estate. It was also represented that the company was comprised of wealthy, Hispanic foreign nationals and was based in South America. The FBI made one of its agents, Robert Dogium, president; Julio Molineiro, a paid confidential informant, agreed to act as a representative for the company.[1] The account of the sting operation that follows is largely undisputed.

### A. Reyes's Initial Involvement with the Cayman Group

---

[1] Agent Dogium's undercover name was Marcos Correa. Molineiro's was Carlos Montero.

First contact between the Cayman Group and Reyes occurred August 1, 1995, when Molineiro and Reyes met at Reyes's district office. The meeting, like most during the operation, was recorded. Molineiro stated that the Cayman Group was looking for opportunities to invest in hotels, resorts, and the like. Reyes referred Molineiro to his brother, Gregg, who, Reyes said, had in the past received $20 million in city contracts. Reyes also introduced Molineiro to a second brother, Tony, who likewise had been successful in obtaining city contracts.

On August 16, Gregg, along with Tony, met with Molineiro. The three discussed the city's plan to build a hotel adjacent to the downtown convention center (the "hotel project"). Gregg explained that one of the bidders on the project, Wayne Duddlesten, had submitted a plan that called for ethnic minority financing (the "Duddlesten plan"). Gregg urged Molineiro and the Cayman Group to consider the project "carefully." The next day, Gregg touted Reyes's ability to push business through the city council. Gregg noted, however, that Reyes's assistance came at a price: "It's not free, that's what Ben says." Gregg requested that Molineiro keep their conversations "very confidential." Later that day, Reyes confirmed that he expected to receive a fee from the developer that won the hotel project.

On August 23, Gregg called Molineiro to confirm the Cayman Group's interest in the hotel project. The next day, Molineiro asked whether Reyes was committed to any other bidders, "or is he

3

going to get the contract for us?"  Gregg responded: "For us!

For us!  Because, well, he's going to be part of this."  On

August 25, Tony emphasized that the Cayman Group's involvement in

the hotel project would be a joint venture, involving "myself,

you, . . . Ben, and Gregg."  Tony, however, cautioned Molineiro

that Reyes "has to be careful . . . [because] it's a conflict of

interest."  At the same time, though, Tony emphasized that "it's

almost certain [that Reyes] can get the deal."  On September 7,

regarding Reyes's involvement in the hotel project, Tony stated

that Reyes's "expenses are included there in several areas. . . .

We have always asked between forty-five and fifty percent.  Let's

say fifty.  I, Ben, and Gregg are going to be included in the

fifty."

On September 13, Tony asked Molineiro to meet him the next

day.  Tony said the meeting was needed to discuss "something very

urgent" but explained that he would "rather not talk too much

about this on the phone."  The next day, Tony provided Molineiro

with a letter expressing interest in the hotel project and asked

him to send it to Duddlesten.  Tony explained that it was Reyes

"who is asking for this."  Tony said the letter was drafted by a

friend of Reyes's who is a consultant to Duddlesten.  Tony also

recommended that the Cayman Group change its name but cautioned

that, whatever name was chosen, it must not suggest a conflict of

interest.  Tony explained that if the Reyeses' interest in the

4

hotel project were exposed, "we'll lose Ben's vote.  So we don't want to do that."

Before the September 14 meeting ended, Tony urged Molineiro to send the letter to Duddlesten by the following day.  Molineiro responded that he had to confer with his associates first.  Tony called Reyes to explain that the letter might be delayed.  Reyes insisted that if the letter was not sent by the next day, the opportunity to invest in the hotel project might be lost.  Tony decided he would send the letter himself, an idea Reyes said would be "a good way for [Duddlesten] to see that we're working on it."

Molineiro had several times invited Reyes and his family to Florida to meet with a partner in the Cayman Group.  On September 23, Reyes, his son, and Tony flew first-class to Florida on tickets purchased by the Cayman Group.  The Reyeses' lodging at a Florida resort was also paid by the Cayman Group.  Reyes and Tony met with Molineiro, Agent Dogium, and a second FBI agent, Len Carey.  The five discussed the opportunity presented by the Duddlesten plan.  Like he had before, Tony warned that Reyes's interest could not become public; further, Reyes himself said that he could not be part of the deal because of his position on the city council.  The last day of the trip, however, Tony backpedaled: he told Molineiro that Reyes expected to be paid for his work on the project but that he felt uncomfortable admitting as much in front of Carey.  Later, with Reyes present, Tony again

5

asked Molineiro to change the Cayman Group's name.  Tony also explained that he and Reyes had selected a Houston representative for the Cayman Group: "[W]e already have a Hispanic lawyer who's very smart . . . [and] a trustworthy friend. . . . He's going to be your partner in this."  The lawyer, Isaias Torres, was described as Reyes's "political friend."  Reyes explained that Torres would act as "the front."

On October 5, Torres delivered to Duddlesten's office the September 14 letter Tony had provided Molineiro.  The letter represented that Torres was the Cayman Group's agent; instead of "Cayman Group," however, the company was referred to as the "Latin American Enterprise Group."  On October 19, Torres attended a city council meeting, the purpose of which was to discuss the competing bids for the hotel project.  Torres's attendance was at the invitation of Duddlesten, who had previously written Torres about the meeting.  Reyes in his capacity as a city councilman was also present at the meeting.  Though he never revealed that he might have an interest in the Duddlesten plan, Reyes asked a number of questions about the competing bids.  In a letter dated October 31, Duddlesten thanked Torres for his support, promised to keep in touch, and enclosed a number of documents concerning the Duddlesten plan.

On November 3, Tony declared to Molineiro that he would no longer participate in the hotel project: "I told Ben, well, if you want to be in charge, you be in charge. . . . I'm going to

retire from all of this."  Reyes confirmed Tony's departure to Molineiro: "I want you to call me directly. . . . From now, we're going to handle it straight."  Reyes said that, henceforth, he was "going to get completely involved" in the effort to secure a piece of the hotel project for the Cayman Group.  Shortly thereafter, Reyes told Dogium that he was interested in investing in real estate purchased at auction; he suggested that the two go in together, each putting up $50,000.  Reyes stated that such an investment would be "my private business" and that it "has nothing to do with the city."  The two agreed to discuss the matter later.

On November 6, Reyes met Dogium at the Cayman Group's offices.  Dogium expressed concern that a Duddlesten competitor might win the hotel project because the competitor was making larger contributions.  Reyes explained the difference between campaign contributions and cash payments and why the latter had greater power to influence than the former: "You spend the cash and it's not accounted for. . . . These guys work day and night for nothing. . . . And you are more on their side than any damn checks that you could give them.  Because they can't even spend those checks to eat."  Dogium agreed but expressed concern that the cash reach its intended target, "so that no one is making an ass out of me."  Reyes empathized with Dogium's concern: Reyes said that he too had been cheated by intermediaries.

Reyes then turned to the subject of the real estate venture he had proposed before. Reyes said that the properties would give him a "front" for any unexplained accumulation of wealth: "Because cash, you can't spend that, if you don't have a front." But Doguim said that the Cayman Group was not interested in Reyes's proposal; however, if the money was for Reyes personally, Doguim said, "that is the way I can help you." Reyes responded that he needed the money for two reasons: "One, for the friendship . . . . And the other is [to] . . . start businesses together." Dogium agreed to give Reyes the money, and Reyes said that he would continue his work for the Cayman Group.

The next day, November 7, Reyes called Molineiro several times, looking for Dogium. Dogium eventually returned Reyes's call: "I'm . . . getting your package together for you," Dogium told Reyes. When Reyes again mentioned his idea to buy real estate at auction, Dogium said, "that's not mine, that is yours." On November 9, Dogium showed Reyes a writing intended to memorialize Reyes's receipt of $50,000 and their business dealings generally. Reyes objected, stating that the money was his private business and not related to the hotel project. At the same time, though, Reyes explained how the properties would effectively deflect questions about the income he expected from the hotel project:

> And then you can do me a favor when this other money comes. . . . [Then, I will] be able to buy myself a damn new car . . . or a suit . . . a very good suit . .

> . and not have the damn people asking, "Where the hell is that bastard getting that money from?" With a hundred, two hundred houses . . . . [y]ou can cover everything with that.

Reyes continued, rehearsing for Dogium what he planned to tell anyone who questioned the source of his new-found wealth:

> Look, you bastard, look. There are two hundred damn properties here, and they bring me one-fifty, two-fifty for each one every month. There it is, you bastard! . . . I have a brand-new Mercedes. I have a half-million-dollar home. Well, right, you bastard. There it is. . . . It comes from these.

On November 17, Molineiro promised Reyes $50,000 in time for the next auction.

On November 29, Reyes met with Molineiro at a Houston restaurant; Reyes again asked for the $50,000. Reyes explained that he did not "even have a damn nickel" for an upcoming trip to Mexico and asked Molineiro for help. Molineiro gave Reyes $1000. On December 1, Molineiro called Reyes with news that the "big package" was ready. That day, at Molineiro's apartment, Molineiro told Reyes that the Cayman Group was pleased with Reyes's efforts: "They all think that you've done an excellent job in helping us get a part of this hotel." Molineiro then gave Reyes a satchel containing $50,000 in fifty-dollar bills.

On December 13, Reyes faxed a letter to the Texas attorney general marked "urgent message." The letter asked the attorney general to determine whether Duddlesten could take advantage of certain tax benefits. The council had delayed its consideration of the hotel project until the tax issue was resolved. On

December 15, the attorney general issued an opinion favorable to Duddlesten.  Reyes, describing his role in obtaining the opinion, said to Molineiro, "that's raw power, man."  Having performed a service valuable to Duddlesten, Reyes suggested that they move to secure the Cayman Group's participation in the Duddlesten plan: "Let's squeeze this bastard[], Duddlesten[], because right now we have him."

### B.  Maldonado's Involvement Begins; Reyes Steps Up His Efforts

On December 21, Reyes and Molineiro met together with Betti Maldonado for the first time.  Sometime before, Reyes and Ross Allyn, Reyes's former aide and at the time an advisor to Duddlesten, had asked Maldonado to assist the Cayman Group with the hotel project.  Maldonado was a public relations specialist and lobbyist, with a particular interest in issues affecting Houston's Hispanic community.  Maldonado also served as a commissioner for the Port of Houston and had experience working on political campaigns.  Before Maldonado arrived at the meeting, Reyes told Molineiro that Maldonado was well-connected to the city's leadership and was a "very good friend."  Reyes also told Molineiro that they would treat Maldonado "as if she were going to do P.R. work for us now."  Reyes gave Maldonado $1500 when she arrived and asked her to lobby certain city council members, the Hispanic chamber of commerce, and the mayor's office on behalf of

10

the Cayman Group.  Maldonado agreed.  Later that day, Reyes and Maldonado, along with Torres, met over lunch.  Neither Molineiro nor Dogium were present and the meeting was not recorded.

Reyes's city council term expired January 2, 1996.  On January 8, Reyes, Allyn, and Molineiro met at the Cayman Group's offices.  The three dissected, member by member, the city council's projected vote on the hotel project.  Allyn remarked that they needed to "touch" Councilman Peavy; he said to Reyes, "Ben, I really need you to work him."  Reyes added that Councilman Yarbrough had requested a cash payment.  The three agreed that, among the council, John Castillo and Michael Yarbrough were best to lead the effort for the Duddlesten plan.  Reyes then stated:

> [W]e're gonna go buy us some leaders. . . . 'Cause that's what it takes, I mean . . . I never did it for nothing. . . . The [guy] wants me to lead. . . . I gotta get fed.  I gotta pay the grocery bills. . . . I never said I . . . ain't no different than you and me! Yeah, he helped me get elected, so what [about] now?

Before Allyn left, Reyes reminded everyone that "all this stuff is just between us."  Then, with respect to Councilman Peavy, Reyes told Molineiro, "I think . . . we promised him five. . . . We'll give him two-and-a-half, and we tell him once we're done . . . once we win, you'll get the other two-and-a-half."  With respect to Councilman Yarbrough, Reyes recommended $3000, half paid before the vote, half after.  Councilman Castillo, Reyes said, should get a lump-sum payment of $3000.

11

On January 10, Reyes asked Molineiro to meet him and Councilman Castillo at a Houston restaurant. Molineiro walked in the restaurant and saw Castillo and Reyes together at the bar. As he approached, Molineiro saw Reyes place an envelope in Castillo's pocket. Castillo promised to support the Duddlesten plan and left. Reyes explained what had transpired:

> I told him, "Look, our group is going to win, and you're going to win. . . . If I win, you will win. I'm never going to forget you. . . . We know you have your own problems, and everything. We're going to help you. This is a gift, eh?"

On January 11, Reyes told Molineiro he had scheduled a restaurant meeting with Councilman Yarbrough for the following afternoon. The next day, on the way to the meeting, Reyes took an envelope containing $1500 from Molineiro's briefcase and placed it in his pocket. As he put the envelope in his pocket, Reyes said, "I'm going to invite him [i.e., Yarbrough] to the bathroom." When they arrived at the restaurant, Reyes introduced Molineiro and told Yarbrough, "in just a while we go to the bathroom." After the three ate, Reyes and Yarbrough went to the men's room together. Leaving the restaurant, Reyes said he gave Yarbrough the money: "I told him, once we win, you'll get another package." Reyes explained that he did not expressly mention that Yarbrough would get cash because he did not want to "scare him."

The next day, January 16, Reyes, Molineiro, and Dogium met Councilman Peavy for breakfast. Before the meeting, Reyes rehearsed what he planned to tell Peavy: "Look, two-and-a-half,

12

and then, once we win, you'll get another two-and-a-half." At the restaurant, Reyes explained to Peavy that he was working to get the city to accept the Duddlesten bid and that he needed Peavy's help. While Peavy and Dogium were alone at the table, Molineiro handed Reyes an envelope containing $2500. Reyes then turned to Peavy: "Let me talk to you a little bit." The two left for the men's room, where Reyes said he gave Peavy the envelope. Leaving, Peavy told Dogium and Reyes that they would talk again before the vote, though Peavy did not expressly promise to support the Duddlesten plan.

On January 18, Reyes met with Molineiro at the Cayman Group's office. Reyes related a remark Dogium made that Reyes might have kept the money intended for Peavy. Reyes expressed his dismay at Dogium's comment:

> [H]e did it like a joke. . . . [W]e are involved in a serious business. . . . Look, . . . what I did there . . . for that I can be sent to the damn jail for life, and more than anything, it would screw up my career. . . . [I]t's not easy to do what I do.

Reyes told Molineiro, "we've been working our asses off, Saturdays, Sundays, . . . and I've been taking packages to the black guys so they will stay with us." Reyes stated that he was not certain whether Dogium could be trusted.

### C. Maldonado's Involvement Grows

The day before, January 17, Betti Maldonado met with Dogium and Molineiro to discuss her lobbying effort for the

13

Cayman Group. Maldonado explained which council members were ripe for influence. Some council members, she said,

> they're real different than our Latinos. They are like, "You tell me what's in it for me first, and I'll vote on it." . . . But our guys are like, "I gotta see if it's right first," then they'll vote on it. You . . . can play with them more.

The next day, Molineiro noted that Yarbrough had already received $1500 from the Cayman Group; Maldonado responded that Yarbrough was "a very close friend of mine" and agreed to see if he wanted more money.

On January 22, Maldonado again met with Molineiro and Dogium at the Cayman Group's office. Speaking of Felix Fraga, John Peavy, and Wayne Duddlesten, Dogium said to Maldonado, "take care of these three people." At the same time, Dogium said he did not want to make anyone feel uncomfortable by what he had asked of Maldonado. Maldonado responded, "no, it's not uncomfortable at all." She also described her relationships with various members of the council: "[W]hen they deal with me, it's more, ah--with [Councilman] Yarbrough, okay, I can get away with more cause he and I are friends--it's very up-and-up, you know. I've never had a relationship with them where I've done what Ben did." But Maldonado emphasized that she did not feel uncomfortable by what Dogium had asked of her. Maldonado also predicted that Yarbrough would support the Duddlesten plan, though she thought he was going to "see how much [he] could get out of the deal."

14

Maldonado arranged for Councilman Yarbrough to meet Dogium at the Cayman Group's offices January 24. Before she left to get Yarbrough, Maldonado asked Dogium and Molineiro to increase her compensation to $9000, plus a bonus if the Cayman Group was successful. The three also discussed whether they ought to have cash on hand for Yarbrough. Maldonado said, "with him, it'd probably never hurt." Maldonado returned to the Cayman Group's office with Yarbrough. Yarbrough and Dogium met in private, and Yarbrough received another $1500 in return for his pledge to support the Duddlesten plan. While Yarbrough and Dogium met, Maldonado said Yarbrough told her that, like the other council members, he too wanted to profit from the hotel project.

On January 31, the city council approved the Duddlesten plan and authorized the legal department to enter into negotiations with Duddlesten. After the vote, Reyes told Molineiro and Dogium they should not give Councilman Peavy the promised second payment because he failed to pledge his support in advance of the vote. Dogium disagreed, stating that they should fulfill their commitment to Peavy, and Reyes agreed to schedule a meeting. Dogium met Peavy and Reyes at a Houston restaurant February 20. When Dogium arrived, Reyes said, "John is ready to leave. . . . He told me that you're going to give him something. Do it right now." The three walked outside, where Dogium thanked Peavy for his support and handed him an envelope containing $2500.

15

In early April, Dogium told Maldonado that Reyes had fallen out of favor with the Cayman Group. Dogium informed Maldonado that he wanted a provision in the hotel contract that would secure the Cayman Group's participation, and the two discussed how to achieve this end. Dogium reminded Maldonado that his influence over the council was unquantifiable: "I'm out a significant amount, you know, we had cash disbursements to council members that I can't put on a piece of [paper]." "I know," Maldonado responded. Maldonado explained that she did not know how much influence Dogium had over the council:

> [S]ince before you guys, I don't really know how much they've--I can't be naive about it either--how much they actually get [in] cash stuff, you know, not on the records? But I . . . was working on this other project for this huge engineering firm and they were giving out money like I've never seen before.

Maldonado suggested how she could help Dogium: "I'm very honest with you. I'm going to tell you how you can get the most for the least. . . . I'm never going to tell you, give just to give. I know what you can get away with, with who." Maldonado, however, said she wanted to check with Reyes before she proceeded. On April 12, Maldonado reported that Reyes had approved her plan to secure contract language favorable to the Cayman Group.

On April 19, Maldonado told Dogium and Molineiro that she would determine whether council members wanted additional payments for their continued support: "I'm gonna just feel them to see, . . . are they just . . . . gonna be interested 'cause

16

it's the right thing, or do they want something more. . . . [W]e can start off by assuming that they're all gonna want something, if you want to do it that way."  On April 23, Maldonado told Molineiro she had obtained commitments from council members Yarbrough, Sanchez, Saenz, and Fraga.  She explained that she had not yet secured Councilman Castillo's support and recommended that they prepare a "package" for him.

On April 29, Maldonado told Molineiro she had scheduled a meeting with Castillo that afternoon at a restaurant.  Molineiro responded that he would prepare an envelope for Castillio, including a letter containing the needed contract language.  As Maldonado watched, Molineiro counted out $3000 and placed it in an envelope.  Molineiro suggested Maldonado show Castillo the letter and then signal for the cash.  At the restaurant, Maldonado gave Castillo the letter; Molineiro left the table and Maldonado handed the envelope of cash to Castillo, who placed it in his portfolio.

The next day, April 30, Maldonado reported that the meeting with Castillo had gone "very well."  She also told Molineiro that she had scheduled a meeting with Councilman Fraga for the following afternoon.  Maldondado told Molineiro to prepare "two grand" for Fraga because "he is in the process of reorganizing his office and he's hiring a consultant to . . . do that, and he really, really needs it."  The next day, Molineiro gave Maldonado an envelope containing $2000 and the requested contract language.

17

At the meeting, Fraga reviewed the language and expressed support for the Cayman Group.  When Maldonado tried to pass him the cash, however, Fraga declined to accept it.

On May 1, Maldonado and Molineiro met Councilman Peavy at a Houston hotel.  The meeting was arranged by Maldonado the previous day, and before the meeting, Maldonado and Molineiro discussed how they would pass Peavy the payment.  When the three met, Peavy reviewed the contract language and stated that he fully supported the Cayman Group.  As he did before, Molineiro got up from the table.  Maldonado then offered Peavy the cash-filled envelope, but he refused to take it.

Later that day, Maldonado expressed frustration over the botched payments: "I have an intimate, friendly relationship with these guys.  But like I told you, I had never, ever dealt with them that way.  Never."  Maldonado contrasted her own experience, however, with that of certain members of the council: "John [Castillo] has already been in this forever, so it's no big deal. Michael [Yarbrough] is also . . . no big deal. . . . And really, Peavy normally is no big deal.  Normally."  Maldonado said she should have paid Fraga and Peavy privately.  The Cayman Group's office, however, would not work: "[T]hey don't really know you guys.  What if you have a camera in there? . . . That's what they think.  One of them already told me that!"  The next day, May 2, Maldonado was confronted by agents of FBI and agreed to cooperate with their investigation.

## II.  PROCEDURAL HISTORY

On July 30, 1997, an indictment was filed in the district court as to Reyes, Maldonado, and four others.[2]  The indictment charged Reyes with six counts: conspiracy to commit bribery; accepting a bribe ($50,000 Dec. 1); making a bribe (three counts: $3000 to Castillo Jan. 10; $1500 to Yarbrough Jan. 11; & $5000 to Peavy Jan. 11 & 31); and mail fraud.  Maldonado was charged with three counts: conspiracy to commit bribery and two counts of making a bribe ($1500 to Yarbrough Jan. 24 & $3000 to Castillo Apr. 30).  The named defendants were tried together to a jury beginning March 10, 1998.  On May 21, the district court declared a mistrial, the jury being unable to reach a verdict.[3]  Reyes and Maldonado were tried a second time--separate from their codefendants--beginning September 16, 1998.  Each moved for a judgment of acquittal at the close of the government's case-in-chief, which the district court denied November 5.  On December 14, the jury found Reyes and Maldonado guilty as to each charged offense.  Reyes's and Maldonado's motions for new trial were denied shortly thereafter.

Sentencing was February 24, 1999.  With respect to Reyes's and Maldonado's bribery convictions, the district court

_____

[2]     The indictment also named Ross Allyn, John Castillo, John Peavy, and Michael Yarbrough.

[3]     The charges against Ross Allyn were dismissed by the district court before jury deliberations began.

19

determined that a two-level upward departure was warranted for conduct it deemed "systematic or pervasive." The effect of this departure raised Reyes's offense level from 26 to 28 and Maldonado's from 20 to 22. Additionally, the district court assigned Reyes two criminal history points for two prior offenses. This adjustment raised Reyes's criminal history category from I to II. The district court sentenced Reyes to 60 months' imprisonment for conspiracy to commit bribery and also for mail fraud, and he received 108 months' for each of his four bribery convictions. All terms were designated to run concurrently. Maldonado was sentenced to 51 months' for each offense, and her terms of imprisonment were likewise designated to run concurrently. Final judgment was entered March 1, 1999, and Reyes and Maldonado each made timely appeals therefrom.[4]

### III. DISCUSSION

On appeal, Reyes argues that the district court erred in the following ways: (1) in finding that there was a sufficient connection between federal dollars and the charged criminal acts under the federal bribery statute; (2) in finding that there was sufficient evidence to support a conviction for mail fraud; (3) in refusing to admit evidence of a May 4 conversation he had with Maldonado; (4) in not finding entrapment as a matter of law; (5)

---

[4]    The remaining codefendants--Castillo, Peavy, and Yarbrough--were tried together beginning March 29, 1999. On May 26, the charges against the three were dismissed by the district court.

20

in not instructing the jury on positional predisposition; (6) in departing from the sentencing guidelines for conduct it deemed "systematic or pervasive"; and (7) in counting two prior sentences as "separate" under the sentencing guidelines. Maldonado joins Reyes as to all but (2), (3), and (7). Maldonado also argues that the evidence is insufficient that she possessed the requisite mental state for bribery or that she conspired with anyone besides a government agent or informant to commit bribery. Our jurisdiction to review these matters is conferred by 28 U.S.C. § 1291 ("final decisions of district courts") and 18 U.S.C. § 3742 ("review of a sentence").

## A. Connection to Federal Dollars

Reyes argues that his convictions under 18 U.S.C. § 666 for federal programs bribery must be reversed because the government failed to establish the required connection between the charged criminal acts and federal dollars. Whether under § 666 the requisite nexus between the criminal activity and federal dollars exists is a question of law we review de novo. See United States v. Westmoreland, 841 F.2d 572, 576 (5th Cir. 1988). Section 666, entitled "theft or bribery concerning programs receiving Federal funds," provides, in relevant part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists--
>     (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--

21

. . . .
(B) corruptly gives, offers, or
agrees to give anything of value to
any person, with intent to
influence or reward an agent of an
organization or of a State, local
or Indian tribal government, or
agency thereof, in connection with
any business, transaction, or
series of transactions of such
organization, government, or agency
involving anything of value of
$5,000 or more. . . .
. . . .
shall be fined under this title, imprisoned not more
than 10 years, or both.

(b) The circumstances referred to in subsection (a) of
this section is that the organization, government, or
agency receives, in any one year period, benefits in
excess of $10,000 under a Federal program involving a
grant, contract, subsidy, loan, guarantee, insurance,
or other form of federal assistance.
. . . .

18 U.S.C. § 666.

In United States v. Westmoreland, we said that § 666 "limits its reach to entities that receive a substantial amount of federal funds and to agents who have the authority to effect such significant transactions." 841 F.2d at 578. In that case, the defendant was convicted of receiving kickbacks on purchases he made for the county government. We upheld the conviction, noting that the defendant "served as a county supervisor" and that the county "received federal revenue sharing funds." Id. at 575. Later, in United States v. Moeller, 987 F.2d 1134 (5th Cir. 1993), we further delineated the reach of § 666, concluding that the "particular program involved in the theft or bribery scheme

22

need not be the recipient of federal funds," id. at 1137 (citing United States v. Little, 889 F.2d 1367 (5th Cir. 1989)). There, the defendants worked for the Texas Federal Inspection Service ("TFIS"), an agency jointly supervised by the Texas Department of Agriculture ("TDA") and the United States Department of Agriculture. The defendants were alleged to have improperly awarded consulting contracts to supporters of candidates for TDA commissioner. One defendant was an associate director of TFIS; the other held various managerial positions. The district court dismissed the indictment, concluding that TFIS did not receive the statutory amount in federal benefits. On appeal, we reversed, concluding that it was enough that the TDA, which in part was responsible for TFIS, received the level of federal funding required under § 666. Id. at 1137.

Applying Westmoreland and Moeller to the case at bar, we conclude that the connection between federal benefits and the charged conduct is sufficient to uphold Reyes's convictions under § 666. It is not disputed that, during the relevant periods in this case, three city of Houston departments received federal funding in excess of § 666's statutory requirement: the Finance and Administration Department; the Housing and Community Development Department, including $28.5 million in fiscal year 1996; and the city legal department.[5] Like the federally-funded

_____

[5] It is also not disputed that the Duddlesten plan, as submitted to the city council, included a loan from the U.S.

23

TDA did with respect to TFIS in <u>Moeller</u>, the evidence in this case shows that these same three city departments shared responsibility for the hotel project: the legal department was responsible for evaluating competing bids to develop the hotel; the finance department was responsible for soliciting bids and coordinating the process through which bids were considered; and the housing and community development agency oversaw revitalization and improvement of downtown Houston, wherein the hotel project was planned.  Further, like the county supervisor in <u>Westmoreland</u> and the senior agency officials in <u>Moeller</u>, here the charged criminal conduct related to city council members, who, by voting up or down on bids, ultimately decide how federal money will be spent.

Reyes argues that we should follow a line of cases decided after the Supreme Court announced its opinion in <u>Salinas v. United States</u>, 522 U.S. 52 (1997).  In <u>Salinas</u>, the Court held that to sustain a conviction under § 666 the government need not show that federal dollars were directly tied to the alleged bribery transaction.  <u>Id.</u> at 58.  The Court, however, declined to detail the connection required under § 666 or even state whether

Department of Housing and Urban Development ("HUD") for approximately $35 million.  As approved by the city council, the HUD loan amounted to $16 million.  Reyes argues that under § 666 the federal dollars must have been "received," whereas the federal dollars for the Duddlesten plan were merely designated. We decline to address this argument in light of our conclusion that other allocations of federal dollars are sufficiently connected to the charged criminal conduct.

24

such a connection is required at all.  <u>Id.</u> at 59.[6]  The two post-

<u>Salinas</u> cases that Reyes urges us to follow now--<u>United States v.</u>

<u>Zwick</u>, 199 F.3d 672 (3d Cir. 1999), and <u>United States v.</u>

<u>Santopietro</u>, 166 F.3d 88 (2d Cir. 1999)--enunciated a degree of

connectivity between the federal dollars and the charged conduct

perhaps more exacting than other recent cases, <u>cf.</u> <u>United States</u>

<u>v. Dakota</u>, 188 F.3d 663, 668 (6th Cir. 1999)(upholding a

conviction under § 666 where the defendant was alleged to have

received kickbacks on an Indian tribe's lease of gaming machines

and the tribe, for purposes not specified by the court, received

yearly federal funds in excess of the statutory amount); <u>United</u>

<u>States v. Grossi</u>, 143 F.3d 348, 350 (7th Cir. 1998)(upholding a

conviction under § 666 where the defendant, a township

supervisor, received kickbacks for making distributions from the

town's general assistance program, which received no federal

money).

We are not convinced that <u>Salinas</u> wrought a change upon our

earlier precedents.  Even if we were to follow the two cases

proffered by Reyes, however, we would arrive at the same result.

In one of Reyes's cases, <u>United States v. Zwick</u>, the Third

_____

[6]      In our recent opinion in <u>United States v. Phillips</u>, 219
F.3d 404 (5th Cir. 2000), we also expressly declined to address
the question, <u>id.</u> at 411 n.9, 412 n.10, though we found that the
absence of a connection between the defendant's position (tax
assessor) and any federal funds reinforced our conclusion that
the defendant was not an agent authorized to act on behalf of the
Louisiana parish that received federal monies, as required by §
666(d)(1), <u>id.</u> at 413-14.

25

Circuit concluded that the uses for which federal funds were provided--snow removal and prevention of stream-bank erosion--bore "no obvious connection" to the charged conduct and that the defendant's conduct did not therefore constitute a violation of § 666. 199 F.3d at 688. There, an elected member of the city board of commissioners was alleged to have solicited money from persons with business before the town's board; one such person needed a permit for sewer access, another had requested a use permit, and a third had sought a city contract for landscaping services. The limited amount of federal funds involved in Zwick, coupled with the specific and narrow purposes for which such funds were given, bears no resemblance to the facts in this case. In Reyes's other case, United States v. Santopietro, the defendant mayor accepted bribes from real estate developers that wanted to influence the decisions of various city departments before which the developers had pending business. 166 F.3d at 91. In that case, the Second Circuit concluded that the connectivity requirement of § 666 was met: "Since federal funds were received by [the city] for housing and urban development programs and the corrupt payments concerned real estate transactions within the purview of the agencies administering federal funds, the requisite connection between the bribes and the integrity of federal funding programs is satisfied." Id. at 93. The facts of Santopietro are in accord with those in this case, and Santopietro's holding, like ours in Moeller, directly

26

contradicts Reyes's argument that the government must tie the federal monies to the specific project involved in the illegal activity.[7]

## B.  Reyes's Mail Fraud Conviction

Reyes challenges his conviction for violation of the mail fraud statute, 18 U.S.C. §§ 1341 & 1346.  To establish mail fraud, the government must show beyond a reasonable doubt "that the defendant (1) used a scheme to defraud, (2) which involved a use of the mails, and (3) that the mails were used for the purpose of executing the scheme."  United States v. Sneed, 63 F.3d 381, 385 n.3 (5th Cir. 1995).  Reyes argues that the government failed to prove the existence of a scheme; that, even if a scheme existed, the use of the mails was a reasonably foreseeable result of the scheme; and that the mailing occurred in furtherance of the scheme.[8]  "In evaluating the sufficiency of the evidence, our standard of review is whether, viewing the evidence in the light most favorable to the government, a

_____

[7]     By letter dated November 7, 2000, Maldonado adopted Reyes's argument concerning the connection between the charged offenses and federal dollars under § 666.  See Fed. R. App. P. 28(i).  For the reasons stated above, we also reject Maldonado's argument.

[8]     Reyes also argues that the government failed to prove intent to harm the property rights of others.  Such a showing, however, is not required where, like here, the defendant was indicted for "honest services" mail fraud.  See 18 U.S.C. § 1346 (defining "scheme or artifice to defraud" under § 1341 to include a scheme "to deprive another of the intangible right to honest services").

27

rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."  United States v. Greer, 137 F.3d 247, 249 (5th Cir. 1998).

We conclude that a rational jury could find that Reyes devised a scheme to surreptitiously and unlawfully benefit from his position on the city council.  The first element of mail fraud--proof of a scheme to defraud--requires that the government prove fraudulent activity and "that the defendant had a conscious knowing intent to defraud."  See United States v. Krenning, 93 F.3d 1257, 1264 (5th Cir. 1996).  The evidence shows that Reyes, while still a member of the city council, agreed to work for the Cayman Group while the hotel project was under consideration by the city.  During the course of his work, Reyes twice received cash payments--$1000 November 29 and $50,000 December 1--along with a trip to Florida and the promise of post-council employment.  The jury heard that, as a sitting city official, Reyes could not legitimately work to advance the Cayman Group's interests in the hotel project; so Reyes asked Torres, his "political friend," to be "the front" for the Cayman Group. Thereafter, Torres acted as a public representative for the Cayman Group, communicating the group's interest in the hotel project to Duddlesten and appearing on behalf of the group at a city council meeting.  Throughout, the evidence shows, Torres coordinated his activities through Reyes and Reyes's brothers.

28

There is also sufficient evidence to conclude that the use of the mails was a foreseeable consequence of the scheme. To prove the second element of mail fraud--use of the mails--the government must show that the defendant did "'an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen. . . .'" See Sneed, 63 F.3d at 385 n.4 (quoting Pereira v. United States, 347 U.S. 1, 8-9 (1954)). "'The defendant need not intend to cause the mails to be used.'" Id. at 385 (quoting United States v. Massey, 827 F.2d 995, 1002 (5th Cir. 1987)). As described above, the evidence would allow the jury to conclude that Torres was part of Reyes's scheme to surreptitiously secure a place for the Cayman Group in the hotel project. In September, Reyes, with the assistance of Allyn and through his brother, Tony, provided Torres with a draft letter to Duddlesten expressing interest in Duddlesten's plan. The letter was written on behalf of the Cayman Group and, as provided by Tony, was printed on Torres's letterhead. On October 5, Torres delivered the letter to Duddlesten's office. Duddlesten, in turn, by letter, invited Torres to attend the October 19 city council meeting concerning the hotel project. Torres attended the meeting, during which Duddlesten and a competitor each presented their bid for the hotel project. After the meeting, in an October 31 letter, Duddlesten thanked Torres for his "efforts to solidify our proposal" and promised to keep Torres advised of the

29

plan's progress.  It was this last letter upon which the government based its charge of mail fraud against Reyes. Duddlesten's thank-you note, the jury could properly conclude, was a foreseeable consequence of Reyes's retention of Torres to communicate his interest in the Duddlesten plan.

Finally, we conclude that there is sufficient evidence to sustain a finding that the use of the mails in this case was in furtherance of the scheme to defraud.  "To be part of the execution of the fraud, . . . the use of the mails need not be an essential element of the scheme. . . . It is sufficient for the mailing to be incident to an essential part of the scheme . . . or a step in the plot."  Schmuck v. United States, 489 U.S. 705, 710-11 (1989)(internal quotations omitted).  The evidence showed that the success of Reyes's scheme to defraud depended upon the Cayman Group's inclusion in the hotel project plan advanced by Duddlesten.  Participation in the plan, at least in part, required a commitment from Duddlesten.  To secure such a commitment, Reyes had to convince Duddlesten of the Cayman Group's financial viability.  At the same time, because an appearance of legitimacy was needed for Duddlesten's support, Reyes asked Torres to act as "the front."  Reyes directed Torres to send a letter to Duddlesten pledging the Cayman Group's support for the Duddlesten plan; later, Torres appeared at the October 19 city council meeting.  Duddlesten's thank-you note to Torres followed.  A rational jury could conclude that an

expression of appreciation by the man whose support of the Cayman Group was essential to the group's participation in the hotel project was a key step in the scheme to defraud.

### C. Maldonado's Bribery Convictions

Maldonado argues that there is insufficient evidence to uphold the first of her two convictions for federal programs bribery,[9] 18 U.S.C. § 666(a)(2), and her conviction for conspiracy to commit federal programs bribery, 18 U.S.C. § 371. Specifically, Maldonado argues that the evidence is insufficient to conclude that she intended to assist in the January 24 bribery of Councilman Yarbrough or that she reached an agreement with anyone besides a government agent to commit bribery. Again, we must view the evidence in the light most favorable to the verdict and may reverse only if no rational jury could have found each element of the charged offense beyond a reasonable doubt. See Greer, 137 F.3d at 249.

There is more than sufficient evidence to conclude that Maldonado possessed the requisite mental state with respect to the bribery of Councilman Yarbrough. To convict under § 666(a)(2), the jury must find that the defendant acted with "intent to influence or reward" a government agent. See 18

---

[9] Maldonado does not contest the sufficiency of the evidence as to her conviction for bribing Councilman Castillo April 29.

31

U.S.C. § 666(a)(2). The evidence was that Maldonado worked for the Cayman Group for more than a month before the Yarbrough payment occurred, from December 21 to January 24. The evidence from that time, among other things, shows the following: that Torres revealed to Maldonado that then-councilman Reyes was being paid to secure a spot for the Cayman Group in the city's hotel project (Dec. 21); that Dogium told Maldonado that a payment had already been made to Yarbrough (Jan. 17); that Maldonado explained that some council members expected compensation for their votes (Jan. 17); that she said that she dealt with most council members on a "very up-and-up" basis but that with Yarbrough she "can get away with more because he and I are friends" (Jan. 22); and that Maldonado said that the reason Yarbrough was reticent to declare his support for the Duddlesten plan is that he wanted to "see how much he can get out of the deal"--"that's his style" (Jan. 22). Then, from the day of the January 24 meeting with Yarbrough, the evidence shows that Maldonado understood that her role with the Cayman Group had evolved--"[I]t's a different deal than when I started. You want me to do a lot more."--and that she said that they ought to have cash on hand for Yarbrough because "with him, it'd probably never hurt." And while Yarbrough and Dogium met on the 24th, Maldonado said that Yarbrough told her he too wanted to profit from the hotel project ("[H]e sees everybody getting rich, and what about

32

him?").[10]  Based on the foregoing evidence, a rational jury could
conclude that Maldonado knew the Cayman Group was engaged in the
bribery of public officials and that, by arranging the January 24
meeting with Yarbrough, Maldonado intended to facilitate such
bribery.

Maldonado contends that she had intended to arrange for
Yarbrough to receive a lawful campaign contribution and that she
did not know that the Cayman Group planned to make an illegal
cash payment.  In support of her argument, Maldonado notes that
the work that she was hired for--public relations and lobbying--
was indisputably lawful.  Maldonado also points to evidence of a
December 21 conversation Reyes had with Molineiro, wherein the
two agreed to treat Maldonado "as if she were going to do P.R.
work for us now."  Testimony shows, however, that within hours
after the Reyes-Molineiro conversation occurred, Torres over
lunch candidly told Maldonado that Reyes was on the Cayman
Group's payroll.  The jury also heard evidence that at the time
of Torres's disclosure Reyes was still a member of the city
council, and that the Cayman Group--as Maldonado well knew--was
actively seeking a place in the city's hotel project.  Although
Maldonado testified that Torres never made such a disclosure, the

---

[10]     Maldonado urges us to consider the "whole context" in
which her January statements were made, stating that the district
court denied her proffer of evidence of the complete
conversations.  Maldonado does not contest the propriety of the
district court's rulings, and therefore we will not consider them
now.

jury, as arbiter of credibility, could have chosen to believe Torres instead.

Other evidence Maldonado relies upon is also subject to contradiction. Maldonado notes that in her conversations with Molineiro and Dogium, the two used ambiguous terms like "help," "influence," and "personal assurances" to describe cash payments the Cayman Group made or planned to make to council members. At trial, Maldonado argued that the use of such language led her to conclude that Molineiro and Dogium were referring to lawful campaign contributions. Maldonado also argues that since Dogium and Yarbrough met in private January 24 she did not have direct knowledge of what Doguim and Yarbrough discussed or that Yarbrough received a cash payment. As detailed above, however, there is evidence upon which the jury could rely to find that Maldonado learned of the Cayman Group's illegal activity soon after she was hired or, in any event, before Councilman Yarbrough was bribed January 24.

Likewise, the evidence is sufficient to uphold Maldonado's conviction for conspiracy to commit federal programs bribery. Conspiracy under 18 U.S.C. § 371 requires an agreement between two or more people to commit a federal crime and an act by one of the conspirators in furtherance of that agreement. See United States v. Jobe, 101 F.3d 1046, 1063 (5th Cir. 1996). "[A] government agent cannot be a co-conspirator and . . . there can be no conspiracy between one defendant and a government

informer." United States v. Manotas-Mejia, 824 F.2d 360, 365 (5th Cir. 1987). Maldonado argues that there is insufficient evidence to find that she agreed with anyone other than Molineiro or Dogium to commit bribery. We disagree.

From the evidence adduced at trial, a rational jury could conclude that there was an unlawful agreement between Maldonado and, among others, Reyes, Torres, and Allyn. "A conspiracy agreement may be tacit, and the trier of fact may infer [an] agreement from circumstantial evidence." United States v. Hernandez-Palacios, 838 F.2d 1346, 1348 (5th Cir. 1988). Based on the evidence, the jury could infer that sometime before Maldonado met with Molineiro and Reyes December 21, Reyes and Allyn briefed her on the Cayman Group, the Duddlesten plan, and the hotel project generally. Maldonado, Reyes, and Allyn were longtime friends. Immediately upon her arrival at the December 21 meeting, Reyes handed Maldonado $1500 cash. Later that day, Isasis Torres, who also was a close friend of Maldonado's, joined her and Reyes for lunch. The evidence from that lunch meeting shows that Torres revealed that Reyes was on the Cayman Group's payroll; Torres asked Maldonado to keep this information secret and she agreed. The evidence of these meetings, in light of that of her illegal acts during the days that followed, would allow a rational jury to conclude that Maldonado agreed to participate in a bribery scheme with someone other than a government agent.

35

Additionally, the record would allow the jury to infer an unlawful agreement arose from Maldonado's meeting with Reyes sometime in early April. By the time of the meeting, Reyes's role with the Cayman Group had been substantially lessened; before Maldonado would agree to continue with the Cayman Group, she told Dogium and Molineiro that she wanted Reyes's approval. On April 12, Maldonado reported that Reyes had given his consent. Thereafter, as described above, Maldonado's statements and conduct lacked little or no pretext regarding the legitmacy of her work for the Cayman Group. Again, from this evidence, and in light of the evidence of her conduct that followed the April meeting with Reyes, the jury could reasonably infer that Maldonado agreed with one or more persons--none of whom worked for the government--to unlawfully influence city officials.

### D.  Entrapment

Reyes and Maldonado each argue entrapment as a matter of law. "Entrapment is an affirmative defense with two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the criminal conduct." United States v. Wise, 221 F.3d 140, 154 (5th Cir. 2000), petition for cert. filed, __ U.S.L.W. __ (U.S. Dec. 4, 2000)(No. 00-7342). "When a jury, which was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same which applies to

36

sufficiency of the evidence."  United States v. Rodriquez, 43

F.3d 117, 126 (5th Cir. 1995).  In other words, we must accept

every fact in the light most favorable to the jury's guilty

verdict, and we may reverse only if no rational jury could have

found beyond a reasonable doubt either (1) lack of government

inducement or (2) predisposition to commit the charged crime.

See United States v. Thompson, 130 F.3d 676, 689 (5th Cir. 1997).

We focus our attention on the sufficiency of the

predisposition evidence.[11]  "Many factors may indicate a

defendant's predisposition. . . ."  United States v. Chavez, 119

F.3d 342, 346 (5th Cir. 1997)(per curiam).  In particular, we

have said that a defendant's ready and willing participation in

government-solicited criminal activity, standing alone, is

sufficient to prove predisposition.  See Wise, 221 F.3d at 154.

Other circuits have likewise recognized the value of a

defendant's eagerness (or lack thereof) as proof of

predisposition.  See United States v. Higham, 98 F.3d 285, 290-91

(7th Cir. 1996)("[W]hether the defendant demonstrated a

reluctance to commit the offense that was overcome by government

persuasion. . . . is the most important factor in evaluating a

defendant's disposition.");  United States v. Skarie, 971 F.2d

317, 320 (9th Cir. 1992)(same).  Other factors that may tend to

prove predisposition include desire for profit; demonstrated

---

[11]    Government inducement is not disputed with respect to
Reyes, but it is with respect to Maldonado, see supra note 13.

37

knowledge or experience with the criminal activity under investigation; the character of the defendant, including past criminal history; whether the government first suggested criminal activity; and the nature of the inducement offered by the government.  See, e.g., Chavez, 119 F.3d at 346; Higham, 98 F.3d at 290; United States v. Hernandez, 31 F.3d 354, 360 (6th Cir. 1994)); Skarie, 971 F.2d at 320; cf. United States v. Brown, 43 F.3d 618, 626 (11th Cir. 1996)(concluding that "entrapment as a matter of law cannot be reduced to any enumerated list of factors for a reviewing court to examine" but recognizing that "several guiding principles" are helpful).

### 1.  Reyes's Predisposition

We conclude that there is sufficient evidence to support a finding that Reyes was predisposed to commit the charged crimes. From the outset, there was good reason to be dubious of the Cayman Group and its representatives: the group was heretofore unheard of, the company was purportedly based outside the United States, and it was composed of wealthy-but-unidentified South American nationals.  Indeed, the evidence shows that Reyes and his brothers recognized that the group had a suspicious air about it: they repeatedly urged Molineiro and Dogium to use a more "American" sounding name, and, according to Reyes, Tony suggested that they ask the police to investigate the group.

Rather than proceed with caution, however, the evidence shows that Reyes without hesitation made himself an integral part of the Cayman Group's business with the city. Reyes arranged for Molineiro to meet with Reyes's brothers, who, in turn, steered Molineiro and the Cayman Group toward the hotel project and Duddlesten's plan to develop it. The evidence shows that Reyes, through Tony, offered to use his position on the council to secure a place for the Cayman Group in the city's hotel project. The evidence also shows that Reyes, again through Tony, asked the Cayman Group to send a letter (which Reyes himself had provided) to Duddlesten expressing interest in Duddlesten's plan to develop the hotel. Reyes got Isasis Torres, his longtime friend and former attorney, to represent the group before the city council. The record also shows that Reyes devised a plan to, in his words, "buy us some leaders." Reyes identified council members he thought would accept bribes and suggested when and how payments should be made. The evidence shows that Reyes recommended that the Cayman Group retain Maldonado to help with the bribery scheme. And the jury could conclude that Reyes's intervention with the Texas attorney general was intended to bring the hotel project to a vote before Reyes left the council.

Further, the record clearly shows that Reyes sought to profit from his illegal involvement with the Cayman Group. In his January 6 comments to Dogium (quoted above), Reyes stated that he expected to receive a substantial windfall from the hotel

39

project.  Several times Reyes asked Dogium and Molineiro for $50,000 to establish a "front" for this anticipated wealth. Although Reyes offered testimony that the money was intended as a loan, the record reveals no evidence of loan documents, agreement papers, or repayments.  Further, on more than one occasion, Dogium rejected any suggestion that the $50,000 was intended to fund a venture separate from the Cayman Group's interest in the hotel project.  The evidence also shows that Molineiro gave Reyes $1000 when he claimed to have run out of money and asked for assistance.  Finally, the jury could take cognizance of the fact that the Reyeses received an all-expenses-paid trip to Florida, as guests of the Cayman Group, in violation of the city ordinances prohibiting the receipt of such benefits.[12]

Reyes also demonstrated that he was knowledgeable and experienced in making and receiving bribes.  On November 6, Reyes told Dogium that bribes were virtually a fact of life for the city council.  The same day, Reyes remembered a conversation with the target of a bribe, wherein he learned that he had been cheated by an intermediary: "I sent you forty.  How did you end up with twenty?"  Later, on January 8, Reyes explained how he, as a city councilman, viewed entreaties for assistance: "The [guy] wants me to lead. . . . I gotta get fed.  I gotta pay the grocery

---

[12]    Reyes offered testimony that Molineiro threatened to kill him if he refused to go to Florida.  This evidence is uncorroborated, and the jury, if it so chose, could have accorded it no weight.

bills. . . . Yeah, he helped me get elected, so what [about] now?"  Although Reyes offered testimony that the foregoing remarks were "puffery" and "bolstering," intended to convince Molineiro and Dogium that he had the ability to advance the Cayman Group's interests, the jury could have chosen to reject the explanation as self-serving.

Moreover, there is little, if any, evidence that the jury could have credited as proof that Reyes tried to disentangle himself from the illegal activity.  At trial, Reyes offered evidence that he and his brothers several times told Molineiro and Dogium that Reyes, by virtue of his position on the city council, could not have a personal stake in the hotel project. But the evidence of these remarks stands in stark contrast to that of numerous other statements wherein Reyes or his associates confirmed Reyes's personal involvement and asked that it be kept secret.  Likewise, evidence that Reyes warned Molineiro and Dogium that their mode of business was not proper in the United States could have been disregarded by the jury as half-hearted at best and wholly at odds with other evidence of Reyes's conduct.

In the face of the foregoing evidence, Reyes urges that the government's elaborate scheme and aggressive inducement defeats the jury's finding of predisposition.  We disagree.  Although there was evidence that Molineiro attempted to foster a familial relationship with Reyes, frequently referring to Reyes in Spanish as his brother, we nor any other court has held that inducement-

41

through-friendship, standing alone, is sufficient to find entrapment as a matter of law.  Reyes also testified that the Duddlesten plan and the promise of ethnic minority participation in its financing presented a "once in a lifetime" opportunity for the Hispanic community and that, with the plan on the table, the Cayman Group arrived exactly when ethnic minority investors were needed.  The jury, however, could reasonably reject Reyes's contention that the Cayman Group, whose representatives showed little respect for the city's laws or its elected officials, presented such an extraordinary opportunity.  Finally, Reyes testified that he had few prospects for post-council employment and that Dogium's offer of a position with the Cayman Group--an offer that Reyes says was made contingent on the group's success in the hotel project--induced him to act as he did.  Again, we think that the jury could reasonably reject Reyes's argument, concluding that Reyes, an elected official who no doubt had accumulated many valuable contacts during his 25 years' of public service, was not faced with a situation so dire that he was induced to act against his predisposition.

### 2.  Maldonado's Predisposition

We likewise conclude that there was sufficient evidence for the jury to find that Maldonado was predisposed to commit the

42

charged crimes.[13]  As noted above, a defendant's eager

willingness to participate in government-solicited criminal

activity is sufficient to prove predisposition.  The linchpin of

Maldonado's argument here is that she did not know about Reyes's

and the Cayman Group's cash payments to council members;

therefore, she argues, her work on behalf of the group, though it

might appear differently to others, did not constitute an eager

willingness to engage in the charged crimes.  Having already

found that the evidence is sufficient to conclude that Maldonado

intended to bribe Councilman Yarbrough January 24, and it being

undisputed that she intended to do the same with respect to

Councilman Castillo April 29, we reject this argument.  We

conclude, therefore, that a rational jury, looking at the

evidence of Maldonado's conduct as an objective manifestation of

her predisposition, could find that she was a willing and eager

participant in the charged acts of bribery.

Maldonado argues that once she became a knowing participant

in the scheme to bribe council members, she "hesitated and

stalled" when Molineiro or Dogium thereafter asked her to meet

_____

[13]     Maldonado was first contacted by someone other than a
government agent or informant.  In United States v. Barnett, 197
F.3d 138, 143 (5th Cir.), cert. denied, 120 S. Ct. 1966 (2000),
we stated that the "defense of entrapment is not applicable where
one is induced to engage in criminal activity by a private
citizen acting alone."  Pointing to Barnett, the government
argues that Maldonado, as a matter of law, could not have been
entrapped.  We need not consider this argument in light of our
conclusion that the evidence is sufficient to find that Maldonado
was predisposed to commit the charged crimes.

43

with members of the council.  She contends that she tried to steer her lobbying efforts toward the mayor and other officials and that she once lied to Molineiro about Councilman Yarbrough's travel plans so that she could avoid a meeting with him. Maldonado also contends that she urged Dogium to make an above-board contribution to Councilman Fraga's campaign for Congress, rather than a cash payment.

Other evidence, however, reveals that Maldonado continued to play an integral role in the bribery scheme right up until the time she was confronted by law enforcement.  In April Maldonado told Dogium, "I'm going to tell you how you can get the most for the least."  On April 19, Maldonado promised that she would determine which council members would want cash for their support, adding "we can start off by assuming that they're all gonna want something."  On April 29, Maldonado handed a cash-filled envelope to Councilman Castillo.  Later that day, Maldonado asked Molineiro to prepare "two grand" for a meeting the next day with Councilman Fraga, who she remarked "really, really needs it."  And on each of the next two days that followed--April 30 and May 1--the evidence shows that Maldonado attempted to pass a bribe.

Like Reyes, Maldonado argues that the government's aggressive inducement defeats any finding of predisposition.  We disagree.  At trial, Maldonado argued that the government's inducement was designed to "tug at the core of her being."  Like

44

Reyes, she contended that the hotel project represented a "historic opportunity for her community" because "of its promise of inclusion to ethnic minorities." A rational jury, however, could have correctly concluded that the introduction of the Cayman Group and its representatives into Reyes's and Maldonado's community did not represent the extraordinary opportunity Maldonado argued that it did.

### 3. Positional Predisposition

Reyes and Maldonado each argue that their respective cases present a question of "positional predisposition," as that concept is described in United States v. Hollingsworth, 27 F.3d 1196 (7th Cir. 1994)(en banc), and that the trial court erred in refusing to charge the jury on the issue. We review the district court's refusal to give a requested jury instruction for an abuse of discretion. See United States v. Dixon, 185 F.3d 393, 402 (5th Cir. 1999).

In Hollingsworth, the Seventh Circuit concluded that "[p]redisposition is not a purely mental state, the state of being willing to swallow the government bait. It has positional as well as dispositional force." 27 F.3d at 1200. To be positionally predisposed, the "defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done

45

so." Id. In United States v. Brace, 145 F.3d 247 (5th Cir. 1998)(en banc), this court, sitting en banc, vacated a panel opinion that had adopted Hollingsworth's positional predisposition doctrine. In so doing, we did not reject positional predisposition outright but instead concluded that the issue was not properly before the court. Id. at 265. We have not since considered the merits of positional predisposition, although in our recent opinion in United States v. Wise, 221 F.3d 140, 155-56 (5th Cir. 2000), we concluded that the defendant there did not show that he was not positionally predisposed under Hollingsworth.

Like we did in Wise, we here conclude that Reyes and Maldonado have failed to show that they were not positionally predisposed.[14] In Hollingsworth, the court stated that public officials such as Reyes are in the position to take bribes. And we conclude that Maldonado, a lobbyist and political activist, had the training, experience, and contacts to satisfy Hollingsworth's positional requirement. Further, we reject Reyes's and Maldonado's argument that the opportunity for ethnic minority investment in a major city project would not have occurred absent the government's sting operation. For one, the government had nothing to do with the Duddlesten plan; and it was

---

[14] In rejecting Reyes's and Maldonado's arguments, we express no opinion as to the merits of the positional predisposition doctrine.

46

that plan--not the Cayman Group--that presented the opportunity Reyes and Maldonado describe.  Nor is it true that absent government involvement no minority investors existed to consider investing in the hotel project; to the contrary, Reyes, in his brief, notes that he had communicated with other minority groups interested in the Duddlesten proposal.  We therefore conclude that the district court did not err in refusing the instruction.

### E.  Exclusion of Recording

Reyes argues that the district court erred in excluding a conversation recorded May 4 between himself and Maldonado.  "We review the district court's admission of evidence for an abuse of discretion."  See United States v. Phillips, 219 F.3d 404, 409 (5th Cir. 2000).  At trial, Reyes submitted that the recording was relevant (indeed essential) to his defense theory--namely, that the things he did and said during the investigation were part of his secret plan to "scam the scammers."  Reyes argues that the exclusion of the recording deprived him of the opportunity to put on an effective defense and therefore violated his right to due process.  Further, he argues that the recorded conversation is not hearsay, and that even if it were so construed, it is excepted as a then-existing mental state.  We reject each point.

At the outset, we note that the opportunity to present evidence, as part of the right to a meaningful defense, applies

47

only to that evidence deemed competent.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986)("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability--even if the defendant would prefer to see that evidence admitted.").  Here, the recorded May 4 conversation is hearsay, and it is not a statement of a then-existing mental state under Rule 803(3) of the Federal Rules of Evidence.  Rule 803(3) permits admission of such statements where, among other things, the statements occurred contemporaneous with the event sought to be proved and the defendant did not have a chance to reflect (i.e., the defendant had no time to fabricate or misrepresent his thoughts).  See United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986); see generally 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.06 (Joseph M. McLaughlin ed., 2d ed. 2000).  The recording in question was made after Maldonado was confronted by law enforcement and pledged to cooperate in their investigation.  At trial, Reyes's attorney stated that Reyes by May 4 suspected that Maldonado was cooperating with authorities.  The likelihood that the conversation was being monitored or recorded makes it probable that Reyes's recorded remarks were more self-serving than they were candid, and therefore their probative value is greatly diminished.  See United States v. Schwartz, 924 F.2d 410, 423-24 (2d Cir. 1991).  Additionally, the duration between the

48

recorded conversation and Reyes's last criminal act (February 20) is large enough for the district court to rightly conclude that the remarks had little or no probative value with respect to Reyes's then-existing mental state.  See Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 213 (1st Cir. 1996)(holding inadmissible state-of-mind evidence where dispute between litigants arose after material time but before evidence recorded).  In short, we conclude that the district court acted well within its accorded discretion in excluding the May 4 recording.

## F.  Upward Departure

Reyes argues that the district court erred in departing from the sentencing guidelines because his case is not atypical from those the sentencing commission considered when it drafted the guidelines.  In United States v. Threadgill, 172 F.3d 357 (5th Cir.), cert. denied, 528 U.S. 871 (1999), we discussed departure under the sentencing guidelines in the wake of the Supreme Court's landmark decision in Koon v. United States, 518 U.S. 81 (1996).  In Threadgill, we said that the propriety of departure depends upon, among other things, "whether the departure factors relied on by the district court were permissible."  172 F.3d at 376.  Impermissible factors include those "already considered by the Guidelines and not present to an exceptional degree" in the case at hand.  See id. at 375.  Whether a factor is a permissible

basis for departure is a question of law we review de novo.  See

Koon, 518 U.S. at 100.

In this case, the district court departed pursuant to

application note 5 of § 2C1.1 of the sentencing guidelines.

Application note 5 provides that  "[w]here the court finds that

the defendant's conduct was part of a systematic or pervasive

corruption of a governmental function, process, or office that

may cause loss of public confidence in government, an upward

departure may be warranted."  U.S. Sentencing Guidelines Manual

("U.S.S.G.") § 2C1.1 app. n.5.  At the outset, we note that if

systematic-or-pervasive corruption were considered part of the

typical bribery offense, the commission would not have separately

provided for departure based on a finding of the same.  See

United States v. Shenberg, 89 F.3d 1461, 1476 (11th Cir. 1996).

Thus, we think it follows that factors concomitant with

systematic-or-pervasive corruption were likewise not considered

by the commission when it crafted § 2C1.1.  We also note that to

the term "systematic or pervasive corruption," application note 5

adds the clause "that may cause loss of public confidence in

government."  The effect of the latter clause is to modify the

former, meaning that the described corruption must be of the kind

that "may" lead to a loss of confidence in government.

Admittedly, there would seem to be few instances where a

"systematic or pervasive corruption of a government function"

could never result in a "loss of public confidence in

50

government."  In any case, a straight-forward reading of application note 5 reveals two points: (1) that the sentencing commission did not consider factors concomitant with systematic-or-pervasive corruption; (2) and that the systematic-or-pervasive corruption that warrants departure is of the kind that may result in a loss of public confidence in government.  With the foregoing construction in mind, we turn to the findings enunciated by the district court.

We conclude that the factors used by the district court to depart from the sentencing guidelines in this case were proper. First, in finding systematic-or-pervasive corruption by the defendant, the district court relied on Reyes's role in the criminal activity.  The district court stated: "the record clearly identifies at least five criminally-responsible participants. . . . The evidence is unquestionable as to the organizer role this defendant played in this offense."  The court's finding with respect to Reyes's role in the corruption is in accord with the meaning of "systematic," "pervasive," or both.[15]  Second, in finding a loss of public confidence, the district court noted the following: that Reyes, by his own admission, had "stained" the city council; that the mayor urged

_____

[15]    See Merriam Webster's Collegiate Dictionary 1198 (10th ed. 1993)(defining "systematic" as, inter alia, "methodical in procedure or plan" and "marked by thoroughness and regularity"); id. at 868 (defining "pervade" as "to become diffused throughout every part of").

51

citizens not to let the verdicts reflect upon city officials generally; that a county judge, in his state-of-the-county address, spoke of "corruption in government" and "envelopes full of cash"; and that "widely reported media coverage of this case . . . has fueled the public perception of corruption of our own city council here in Houston." These findings are consistent with the conclusion that Reyes's systematic-or-pervasive corruption may result in a loss of public confidence in government.

Reyes argues that cases wherein courts have upheld departure under application note 5 show that the factors that give rise to a finding of systematic-or-pervasive corruption are markedly more severe than those in his case. Reyes urges us to consider three circuit-court opinions: United States v. Reece, No. 97-4106, 139 F.3d 895 (4th Cir. Mar. 17, 1998)(unpublished table opinion) available at 1998 WL 116163; United States v. Shenberg, 89 F.3d 1461 (11th Cir. 1996); and United States v. Schweitzer, 5 F.3d 44 (3d Cir. 1993). In Reece, the defendant was a manager of the Bureau of Alcohol, Tobacco, and Firearms aircraft leasing program. During the course of a five-year scam, the defendant made 22 false submissions for aircraft leases and bilked his agency out of over a half-million dollars. The sentencing court recognized the record size of the theft, that the case had generated significant controversy, and that the defendant's conduct may result in a loss of public trust. Reece, 1998 WL

52

116163, at *2. In the second case, Shenberg, the defendant, a state-court judge, took bribes to fix cases, enticed other judges to do the same, and revealed the identity of a government informant, knowing that the informant might be killed. The Eleventh Circuit concluded that "the government overwhelmingly proved systematic corruption by a preponderance of the evidence. . . . [and that a] loss of public confidence in government, of course, is not subject to reasonable dispute." Shenberg, 89 F.3d at 1476-77. And, in Schweitzer, the defendant, in violation of federal law, obtained and sold confidential information on individuals from the Social Security Administration, which he then sold for about $10,000. The Third Circuit concluded that the "evidence supports the district court's conclusion that Schweitzer's conduct went well beyond the heartland bribery offense covered by § 2C1.1 both because of its extent and because of the consequence of that conduct for the large number of victims that it impacted." Schweitzer, 5 F.3d at 47.

We find nothing in the above-discussed cases that mitigates against departure in this one. Admittedly, Reyes's corrupt acts were far less disturbing than those committed by the state-court judge in Shenberg. But we note that the court there found that, in light of the defendant's conduct, the propriety of departure was not subject to reasonable dispute. Reyes makes much of the fact that, unlike the defendant in Reece, his alleged corruption pertained to a single project and that the amounts involved were

53

comparatively small.  Whatever the effect of these distinctions, however, we note that, unlike the defendant in <u>Reece</u>, Reyes went out of his way to entice other government officials and citizens to involve themselves in his corrupt scheme.  And though the defendant in <u>Reece</u> was a high-ranking ATF official, Reyes, a long-time city council member, was at the apex of city government and had responsibilities that affected the lives of hundreds of thousands.

Finally, Reyes argues that the district court's reliance on media coverage as an indicator of potential loss of public confidence is improper because that factor is invariably present in the typical public corruption case.  This point, however, is refuted by two of the cases Reyes relies on here: in both <u>Reece</u> and <u>Schweitzer</u>, the courts considered media coverage relevant in evaluating whether there was a potential for loss of public confidence.  And while Reyes may be correct in his assertion that media coverage is attendant in more public corruption cases than not, we again note that the systematic-or-pervasive conduct that warrants departure must have the potential to cause a loss in public trust.  Of course, the media has long played an important role in rooting out and reporting on such conduct.

Lastly, Reyes argues that § 5K2.7 of the sentencing guidelines shows that the circumstances in this case do not warrant departure.  We disagree with this point too.  The district court did not rely on § 5K2.7, entitled "Disruption of

54

Government Function (Policy Statement)," to depart from the guidelines; as already noted, departure was based on application note 5 of § 2C1.1. Application note 5, however, references § 5K of the guidelines. But this reference is to chapter 5, part K generally ("Departures"), and not § 5K2.7 specifically. Part K, among other things, discusses departure as a policy matter, see § 5K2.0, and enumerates certain factors that may warrant departure, e.g., § 5K2.1 (death), § 5K2.2 (physical injury). The grounds for departure provided in part K are in addition to those, like application note 5, that are found elsewhere in the guidelines. See U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). Accordingly, whether departure is warranted under application note 5 of § 2C1.1 is not dependant on whether it is also warranted under § 5K2.7.[16]

### G. Adjustment for Reyes's Criminal History

Reyes argues that the district court erred when it counted two misdemeanor charges for which he received deferred adjudications as "separate" when it made an adjustment for prior

---

[16] In her brief, Maldonado adopts Reyes's argument with respect to the district court's upward departure from the sentencing guidelines. As seen above, the question whether departure is proper requires that the appeals court consider the factors relied upon by the sentencing court. Based on our review of the record, however, it does not appear that the relevant portions of Maldonado's sentencing were transcribed. Under the rules of this circuit, it is Maldonado's responsibility to order transcripts from the pertinent proceedings. See 5th Cir. R. 10(b)(1). We therefore do not consider Maldonado's departure argument.

criminal history.  Under the sentencing guidelines, two or more prior sentences are "related" (and are therefore counted as one for purposes of determining criminal history) if, among other things, they were consolidated for trial or sentencing.  <u>See</u> U.S.S.G. § 4A1.2 app. n.3.  Reyes argues that his prior offenses--one an election code violation, the other theft of a tree--were consolidated and therefore are "related" under the guidelines.  Reyes admits, however, that there was no state-court order that consolidated the two cases.  We have rejected this argument before.  <u>See</u> <u>United States v. Valazquez-Overa</u>, 100 F.3d 418, 423-24 (5th Cir. 1996)("Moreover, as we have recognized in the past, there can be no informal consolidation of offenses under Texas law.")(citing <u>United States v. Garcia</u>, 962 F.2d 479 (5th Cir. 1992).  We conclude that the district court's characterization of Reyes's prior offenses was proper and that Reyes's argument is without merit.

## IV.  CONCLUSION

For each of the foregoing reasons, Reyes's and Maldonado's respective convictions and sentences are AFFIRMED.